**CITY OF DALLAS, Appellant,**

v.

**Billie Jo Lane RASH et vir, Appellees.**

No. 16303.

Court of Civil Appeals of Texas.

Dallas.

Jan. 31, 1964.

Rehearing Denied Feb. 21, 1964.

H. P. Kucera, City Atty., N. Alex Bickley and Kenneth C. Dippel, Asst. City Attys., Dallas, W. H. Frank Barnes, Terrell, for appellant.

Wynne & Wynne, Wills Point, Clyde Elliott, Jr., Canton, for appellees.

WILLIAMS, Justice.

In the exercise of its right of eminent domain (Art. 1109, Vernon's Ann.Civ.St.) the City of Dallas instituted condemnation proceedings to take for pipeline purposes 8.2 acres of land out of a 210 acre tract of land in Van Zandt County, Texas belonging to the appellees. Prior to the taking of this land appellees had subdivided this property into lots. The property taken by the City coincided with 38 lots leaving other lots both to the north and south of the pipeline. The title taken by appellant is that of a fee simple title, with the exception of the oil, gas and other minerals being reserved to the landowners and also reserving to the landowners certain rights to the use of the surface of the land. The date of taking is agreed to be March 17, 1961.

The pipeline for which the land was taken was officially known as the Iron Bridge Water Transmission Line and extended from the Iron Bridge Reservoir at Lake Tawakoni (located in Van Zandt, Rains and Hunt Counties) to the City of Dallas. Lake Tawakoni was constructed by the Sabine River Authority of Texas, and financed by the City of Dallas, for the purpose of supplying waters to the surrounding towns and particularly to the City of Dallas.

The trial court sustained a motion for summary judgment decreeing the right of the City to take the property leaving only the question of values of the land taken and the damages to the remainder. Appellant offered no evidence before the jury and the trial court submitted the case in conformity with the suggested issues by the Supreme Court in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, 201. The jury found, in answer to Special Issue No. 1, that the market value of the 8.2 acres of land, same being the 38 lots taken by the City of Dallas for pipeline purposes on March 17, 1961 and considered as severed land, was $19,000. In answer to Special Issue No. 2, the jury found that the market value of the remaining unsold acreage, constituting the lots adjoining the land taken, immediately before the taking was $9,000 and, in answer to Special Issue No. 3, the value immediately after the taking, was $7,200. The trial court rendered judgment in favor of appellees, based upon this jury verdict, and from such judgment the City of Dallas appeals. We have carefully considered the thirty points of error advanced by the City of Dallas and finding them to be entirely without merit we overrule the same and affirm the judgment of the trial court.

■ Appellant's principal contention on appeal is contained in its Points 1, 2, 3, 27 and 28. In essence these points complain of the refusal of the trial judge to allow appellant to present testimony in reference to the enhanced value of appellees' property resulting from the construction of Iron Bridge Reservoir and the Iron Bridge Transmission Line, it being the theory of the City of Dallas that the concept, inception, planning, construction and completion of the projects known as Iron Bridge Reservoir and the Iron Bridge Transmission Line were so interrelated that it was one project and therefore condemnees would not, as a matter of law, be entitled to any enhancement of value of their property as a result of the improvements by the City of Dallas. By these points the City contends that the trial court should have permitted it to introduce evidence to demonstrate that but for the City of Dallas the Iron Bridge Reservoir and the transmission line would not have been constructed and that, in effect, both projects were one and the same and that these facts would bring into application the well recognized rule that the condemnee is not entitled to the benefit of the enhancement of value by the very project itself which resulted in condemnation.

Since these points do constitute the foundation of this appeal we deem it necessary and desirable to recite a portion of the testimony offered by the City, and refused by the court, as well as legislative history surrounding the Lake Tawakoni project.

The 51st Legislature, Acts 1949, Chapter 110, Page 193 (Art. 8280–133, V.A.C.S.)

created a governmental agency of the State of Texas known as "Sabine River Authority" with the right to develop the water resources of the Sabine River and its tributaries. Thereafter, by Acts 1955, 54th Legislature, Chapter 93, Page 373 (Art. 8280–133, § 14(r), V.A.C.S.) it was provided that a dam shall be constructed on the Sabine River at Iron Bridge Crossing by January 1, 1958 and that if such construction was not started by that date any other political subdivision or municipal corporation within the watershed should be empowered to construct such dam. By Acts 1955, 54th Legislature, Chapter 101, Page 379, §§ 1 and 3 (Art. 8280–133, §§ 1(a) and 18(a), V.A.C.S.), the name of "Sabine River Authority" was changed to "Sabine River Authority of Texas" and such Authority was authorized to issue bonds in the sum of $50,000,000 to use in carrying out the purpose of the Authority.

Pursuant to Acts 1961, 57th Legislature, Chapter 38, Page 151 (Art. 1109h, § 4, V.A.C.S.), it was specifically provided that an eligible city may issue revenue bonds to cover the entire cost to be incurred by the Sabine River Authority of Texas in constructing the water supply project. It was therein specifically provided that the construction and operation of the water supply project will remain the responsibility of the Authority and that the City will have the responsibility of constructing and operating, and shall own all of such facilities and property, including the intake, pumping stations, pipelines and equipment, treatment and filtration plants, and all intermediate and terminal reservoirs.

The City attempted to offer evidence of James A. Cotton, an engineer, to the effect that after the severe water shortage in the City of Dallas in the early 1950's, the City Council in June of 1953 appointed a citizens' committee to undertake a long range water study for the City. This committee hired a consulting engineering firm who made a study of the long range water needs of the City and made a recommendation which included the building of the Iron Bridge Dam and Reservoir. This recommendation, made in 1955, demonstrated the Iron Bridge Reservoir and the pipeline leading from such reservoir to the City of Dallas. The witness Cotton testified that the lake would not have been built except for the fact that there was a need for the City of Dallas to purchase this water. The City introduced in evidence, as a part of its bill of exception, the contract entered into between the City of Dallas and Sabine River Authority of Texas on July 14, 1956 whereby it was agreed that the Sabine River Authority of Texas would construct the Iron Bridge Reservoir and that the City of Dallas would finance the same with the proceeds of revenue bonds issued by the City of Dallas. The contract further provided that the City would have the permanent right to 80 percent of the water impounded and withdrawn from the reservoir. The contract clearly delineated the division of duties in connection with the reservoir and appurtenant facilities. It was therein provided that: "The Authority shall acquire and own in its name, all land and flowage easements required for said reservoir and dam and for the operation thereof, shall construct and own the dam, spillway and outlet works, all of which land, flowage easements and properties collectively being known as the 'Project' ". As to the City it was provided that: "Dallas shall construct and own the intake and pump station, together with the pipeline facilities connecting the intake with the pump station, all to be used for withdrawal of its share of the stored water, collectively known as 'Dallas-owned facilities'."

The record reveals that the first contract for the construction of the dam was awarded by the Sabine River Authority of Texas in March of 1957 and the completion contract was awarded on January 3, 1958. The engineering phase of the pipeline work was begun by the City of Dallas in 1955 but the actual contract for the building and construction of the pipeline was first awarded by the City in July of 1961 after the completion of the dam and after it began to impound water in the reservoir.

The trial court refused the right of the City to allow its witnesses to testify as to the values of the land sought to be taken exclusive of the improvements caused by the construction of Lake Tawakoni, and such testimony is presented in the record by a bill of exception.

It is appellant's position that all of this prior history, tendered by a bill of exception, clearly demonstrates that the lake would not have been built except for the pipeline; that the pipeline is a necessary part of the lake in order for the City of Dallas to obtain its 80 percent of the water belonging to it. The City further contends that since these facts were known to appellees at the time they planned and engineered their subdivision that appellees are not in a position to claim the enhancement of value of their property due to the construction of the lake.

■ Appellant contends that it was entitled to have the excluded testimony developed before the jury and also to have the court instruct the jury, in arriving at their answer to the value of the land taken, that they should not consider any enhancement of the value thereof caused by the construction of Lake Tawakoni and the pipeline project. Appellant relies upon such cases as United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; United States v. Certain Lands in Town of Narragansett, 1 Cir., 180 F. 260; John L. Roper Lumber Co. v. United States, 4 Cir., 150 F.2d 329; Scott v. United States, 5 Cir., 146 F.2d 131; United States of America v. 158.76 Acres of Land, 298 F.2d 559, 92 A.L.R.2d 766; State v. Vaughan, Tex.Civ.App., 319 S.W.2d 349; Vey v. City of Fort Worth, Tex.Civ.App., 81 S.W.2d 228. These cases announce the rule, as demonstrated in United States v. Miller, supra, as follows:

"Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker. Thus although the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor

as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value."

■ This rule is recognized in Texas as illustrated by the statement of the court in State v. Vaughan, supra:

"When property is taken for a public purpose by condemnation the condemnor should not be required to pay for an increased value due to the public improvement. Housing Authority of City of Dallas v. Hubbard, Tex.Civ. App., 274 S.W.2d 165."

While the authorities cited by appellant are strongly persuasive we do not believe that they are controlling of the factual situation presented on this appeal. In the first place it must be observed that most of the authorities relied upon by appellant are cases involving the construction and application of an act of Congress, as opposed to a Texas statute, or have to do with statutes of other states. The Texas cases relied upon by appellant are clearly distinguishable from the facts here presented.

We believe that the correct rule to be applied in the disposition of this appeal is laid down in the case of City of El Paso v. Coffin, 40 Tex.Civ.App. 54, 88 S.W. 502. In that case, the City of El Paso, with the right of eminent domain, and also the railroad companies also possessing this right, entered into an agreement for the construction of certain improvements within the City of El Paso. The railroad companies were to condemn and improve certain property as a depot site. The City was to condemn property not being condemned by the railroad companies for park purposes. The railroads proceeded with their condemnation and improvements but the City awaited the completion of these improvements and did not file condemnation actions until after the railroad improvements were completed. The City insisted before that court, as the City does in this case, that the proceedings were a joint project between the City and the railroad

and they were therefore entitled to have the condemned land valued at a time before the improvements were made by the railroad. The court, in refusing this contention, laid down the general rule as follows:

"It is held generally, in cases presenting the appropriate facts, that, where a person's entire property is included in one general proceeding of condemnation for a particular purpose, it is not permissible to consider that purpose, or the results thereof, in estimating the owner's compensation. The reasons for this rule are apparent. To permit it would be to take into consideration the condemnation proceeding itself as a factor, which is not allowed. Further, it is evident in such a case that the taking, and the effect on the value from such taking, would be concurrent, and such increase would not exist when the taking occurs. The person's property is taken and is absorbed in the purpose for which it is taken, and to allow him a compensation based on the value which the property would have had if not taken would be giving it a status it could not possibly have had in the very nature of the act."

The court then said:

"Such, we think, would be the case here if this property and the other property acquired as a depot site were being condemned by the railway companies simultaneously in a common proceeding. But the property is not being condemned by the railway companies, nor is it being condemned for its purposes. Furthermore, at the time at which the law requires this property to be valued, the companies had already acquired the property to be used for their purposes. The case of the city could have no better footing than would have been the case had the railway companies, after acquiring the grounds for the erection of their depot, proceeded to condemn this property as additional grounds. The case of

[Gulf, C. & S. F.] Ry. [Co.] v. Brugger [24 Tex.Civ.App. 367] 59 S.W. 556, is, we think, an authority on this state of case."

Continuing, the court concluded:

"It is true the original ordinance, the provisions of which were accepted by the railway companies, contemplated, and, we shall say, stipulated for, the acquisition of defendant's land by the city for a public park, and, when acquired, that it should be kept in order by the said companies or the Union Depot Company. This, we think, is not a factor in respect to the rights of defendant. His constitutional right in this involuntary proceeding, as further defined by our decisions, was to be awarded the value of this land at the time it was taken, and this time is not to be referred back to a previous time, when the taking was first contemplated or decided upon by the city."

We also believe that the decision of this court in City of Dallas v. Shackelford et al., Tex.Civ.App., 200 S.W.2d 869, certified questions answered by Supreme Court, 145 Tex. 528, 199 S.W.2d 503, is directly controlling of this appeal. In that case the same appellant herein was attempting to present to the court practically the same contention which they are making now, namely, that a tract of land being taken should be valued as of a time when the City had originally contemplated taking the property. In that case the facts reveal that on June 28, 1941 the voters of the City of Dallas authorized the issuance and sale of tax supported bonds for the purpose of acquiring lands on which to erect and establish a public municipal market, designating certain lands to be taken for that purpose. On December 10, 1941 the City Council of Dallas adopted a resolution stating that since the adoption of the prior resolution the declaration of war against Japan and the general unsettled conditions do not make it advisable or advantageous to embark upon the full realization of the

public improvement and that certain property was designated for the present purpose. A portion of the property was acquired and a market erected. In 1944 another resolution was adopted to take Shackelford's property, being in the original area sought to be condemned, and in that proceeding of condemnation the City took the position that the value of the land could not properly include the enhancement of the value caused by the erection of the market. This court rejected that proposition, and was sustained by the Supreme Court. In doing so we relied upon the authority of the City of El Paso v. Coffin, 40 Tex.Civ.App. 54, 88 S.W. 502, above discussed, and in doing so we said:

"If appellees' property had been designated in the resolution of December 10, 1941, for immediate acquisition, by purchase or condemnation, along with the other properties so designated for that purpose, doubtless the condemnation could be considered simultaneous and in a common proceeding; but such was not the case. When, in the fall of 1944, the city finally decided to acquire the property by purchase or condemnation, it had already been benefited and enhanced in value as the result of improvements made by the city as the result of an entirely separate and disassociated proceedings. So we conclude that, in fixing the value of appellees' property as of the date it was taken,—January 4, 1945, it was entirely proper for the jury to take into consideration its enhanced value due to the previous steps taken by the city towards the establishment of a public municipal market. This conclusion, in our opinion, is supported by the following Texas cases: City of El Paso v. Coffin, supra; Gulf, C. & S. F. R. Co. v. Brugger, 24 Tex.Civ.App. 367, 59 S.W. 556; McChristy v. Hall County, Tex.Civ.App., 140 S.W.2d 576; and San Antonio etc. Ry. v. Ruby, 80 Tex. 172, 15 S.W. 1040."

In McChristy v. Hall County, Tex.Civ. App., 140 S.W.2d 576, the court held that if the condemnation is a part of an independent proceeding that the owner is entitled to the enhancement of the value brought about by a previous taking. The court said:

"The rule is well established that the owner of property condemned for public use is entitled to a judgment based upon the fair market value of his property at the time it is taken. The fact that previous improvements have been made by the condemnor or others is a factor which it is proper to consider in arriving at its value."

The court further said:

"The benefits and enhancements in value that had already accrued on account of the previous improvements or the enterprise that had already been initiated to establish and build the road are not matters to be considered as offsets when subsequent condemnations such as this are instituted. The owner is entitled to such compensation as is warranted by the facts shown to exist at the time the land is taken. (Citing cases)."

One of the most recent cases involving this subject is State v. Willey, Tex.Civ. App., 351 S.W.2d 900 wherein Justice Wilson of the Waco Court of Civil Appeals discussed the authorities and arrived at a similar conclusion. In that case Orange County acquired a strip of land in 1951 from appellee as right-of-way for a designated free access state highway. In 1956 appellee subdivided land he owned adjoining the right-of-way and sold lots from this subdivision. At that time no highway construction had been commenced. After 1956 the State Highway Commission changed its plans and designated a limited access highway along the route earlier designated which required the acquisition of the additional track taken in the present proceedings. The State complained that

the court erred in admitting opinion evidence as to the value of the last site taken based in part on the enhancement of its value due to the prior acquisition of the first tract for highway purposes. The court rejected the State's contention and, among other authorities, quoted 4 Nichols, Eminent Domain, (3rd Edition 1951) Sec. 12.3151(3), Page 127:

"If a definite area has already been condemned, the market value of the neighboring property is naturally affected thereby. If an enhancement in value results such property is entitled to the benefit thereof. It follows that if the original project is subsequently enlarged so as to embrace additional property, such additional property as is involved in the supplemental taking is entitled to the benefit of any enhancement in value which resulted from the original taking."

See also 1 Orgel, Valuation Under Eminent Domain, (2nd Edition 1953) Sec. 104, Page 443, wherein it is stated:

"While the decisions of courts are not in accord on the question of whether an enhancement in value caused by the very improvement for which the land is taken should be considered, they would probably all agree that an increase in value resulting from a prior and separate improvement should be allowed."

In arriving at an answer to this problem it must be borne in mind that the two projects, the Iron Bridge Reservoir or Lake Tawakoni, and the Iron Bridge Transmission Line, are separate and distinct. The sole responsibility for the construction, ownership and management of the Iron Bridge Reservoir is designated by special act of the Legislature in the Sabine River Authority of Texas. The responsibility for the construction, ownership and operation of the pipeline is expressly granted by special act of the Legislature to the municipality. The contract between the City of Dallas and the Sabine River Authority of Texas is clear and explicit in dividing the areas of responsibility, not only for the construction of the two projects, but the ownership and management thereof. It should also be noted that the right of eminent domain is conferred upon the Sabine River Authority of Texas by special act of the Legislature and such right of eminent domain is different from that afforded the City of Dallas, Sabine River Authority of Texas v. McNatt, Tex.Civ.App., 337 S.W. 2d 325, reversed on other points, Sabine River Authority of Texas v. J. P. McNatt, 161 Tex. 551, 342 S.W.2d 741. In accordance with designated authority the Sabine River Authority of Texas proceeded to acquire, by condemnation, the necessary lands for the construction of the Iron Bridge Reservoir, or Lake Tawakoni. This it did prior to the time the City of Dallas decided to begin the acquisition of property by eminent domain for the construction of the pipeline project. At the time the condemnation was filed by the City of Dallas in this case the reservoir of Lake Tawakoni had already been completed and appellees had laid out and subdivided the property owned by them. It is undisputed in this record that the value of appellees' property had undoubtedly been enhanced by the construction of the Iron Bridge Reservoir or Lake Tawakoni, but unless it can be said that the construction of the lake and the construction of the pipeline are one and the same thing, indispensible to the other, then, under the authorities above cited, we see no basis for appellant's contention that appellees ought to be deprived of the enhanced value due to the construction of the pipeline itself. Under the facts as demonstrated in this record we do not believe that the pipeline was an indispensible or integral part of the lake itself. While it is true that Dallas is the principal beneficiary as a result of the construction of the lake yet the law is plain and explicit in its terms granting to other eligible cities and communities the right to also acquire water from the lake.

We think it also important to consider the timing in this case. While it is true that the City of Dallas completed its engineering phase of the pipeline as early as 1955, and told people, including appellees, where the pipeline would probably be laid, yet it did not actually begin construction of the pipeline until 1961, following the completion of the lake. There is no evidence that the City of Dallas was required or compelled to lay the pipeline at any particular time. While it had the right to 80 percent of the water in the lake it might reasonably, and for reasons best known to itself, refrain from taking the water until a later date. Also, it could have exercised its right of eminent domain at an earlier date, prior to the time appellees made the improvements to their property. As the Supreme Court said in Texas Western Ry. Co. v. Cave, 80 Tex. 137, 15 S.W. 786:

"If defendant is now compelled to pay more for a right of way than it would have been compelled to pay had condemnation been made at an earlier day, this results from its own failure to take such steps at an earlier period as it might and ought to have taken * * *."

See also Allen v. M. K. & T. Ry. Co., Tex.Civ.App., 25 S.W. 826; Gulf C. & S. F. Ry. Co. v. Brugger, 24 Tex.Civ.App. 367, 59 S.W. 556; and Panhandle & G. Ry. Co. v. Kirby, 42 Tex.App. 340, 94 S.W. 173.

The Commission of Appeals in State v. Carpenter (opinion adopted by Supreme Court), 126 Tex. 604, 89 S.W.2d 194, correctly enunciated the rules to be followed in condemnation cases. As there stated the jury is to assess the value of the property taken at the time it is taken and to consider the elements of damage which are properly contained in the court's charge. The trial court in this case carefully followed the Supreme Court in submitting the issues suggested in the Carpenter case, including instruction on the elements of value. We think the trial court was correct in this regard.

Finding no error on the part of the court in refusing appellant's tendered testimony we overrule appellant's Points 1, 2, 3, 27 and 28.

By its next group of points (4, 5, 6, 7, 8, 10, 11 and 12) appellant complains of the action of the trial court in allowing witnesses for the appellees to testify concerning values of 38 separate and individual lots taken rather than a single parcel of 8.2 acres of land, and also by allowing testimony concerning damages to the remainder as being 18 individual lots, rather than as one tract of land.

As stated above, the property owned by appellees had been subdivided following the building of Lake Tawakoni but prior to the time of taking of the land for pipeline purposes. Upon the trial of the case the court permitted appellees' witnesses to testify as to the value of each separate lot as such, as 38 different parcels of land, and the remainder was treated as 18 parcels of land, being separate lots adjoining the tract taken. The testimony is uncontradicted that the highest and best use for the property was a subdivision within the area where it was located. Moreover, not only was the property suitable for this purpose, but it had actually been divided and lots had been sold with reference to the plat within the subdivision. The position of appellant in this case has been decided against it in City of Denton v. Hunt, Tex.Civ.App., 235 S.W.2d 212, wr. ref. n. r. e., which involved a taking of divided lots, as in this case. There, the court said.

"Where land not devoted to any special use has been divided into blocks and lots upon a map by the owner of a plot, and sales have been made with relation to streets shown on that map, although reference is not made to it, the property should prima facie be treated as lots and blocks in ascertaining damage, * * *."

The court further said:

"We also note the rule laid down in 29 C.J.S., Eminent Domain, § 140, p.

984: ' * * * Where, however, the land has been laid out in blocks and streets for many years, and it has been recognized, treated, and dealt with by the owners and the people as blocks and streets, such blocks should be treated as distinct tracts.' "

We find no error reflected in these points and they are overruled.

By its 9th, 20th and 21st points of error, appellant contends that the trial court was not justified in permitting a consideration of damage to remainder because the part taken consisted of 38 lots and there was no remainder, as a matter of law.

■ The principal case relied upon by appellant in support of these points is City of Denton v. Hunt, Tex.Civ.App., 235 S.W. 2d 212, err. ref. n. r. e., above discussed. In City of Denton v. Hunt, supra, the question presented was damages allowed to *noncontiguous* lots to the strip of land taken for highway purposes. The court, in that case, drew a distinct difference in law between *contiguous* and *noncontiguous* property to the land actually taken. In this case the court confined the jury's consideration to damages to those lots *actually contiguous* to the strip of land taken by the city. There was sufficient evidence to justify the submission of these issues.

■■ In its 13th and 14th points appellant bitterly assails the testimony of the witness Irby Mills, a real estate appraiser who testified for appellees, contending that such testimony was entirely inadmissible and unworthy of being believed. We have carefully reviewed the entire testimony given by this witness and while it is true that he did testify to considerable variances in values, and especially comparable values, yet we do not find that the admission of such testimony was of such a nature as to constitute reversible error. In the first place, the weight to be given to the testimony of the witness was for the jury and apparently the jury did not allow themselves to be influenced considerably by such testimony because their findings relating to value were less than that testified to by Mills. While we do not think it was error to admit the testimony of the witness yet if it was error the same was harmless. Rule 434, Texas Rules of Civil Procedure.

We have carefully considered each of appellant's remaining points and find the same to be related to and are different shades of the same points previously argued and considered, and finding no merit to any of them we overrule them.

The judgment of the trial court is affirmed.

Affirmed.