**TRINITY RIVER AUTHORITY of Texas, Appellant,**

v.

**J. P. BOONE, Appellee.**

No. 15384.

Court of Civil Appeals of Texas, Houston (1st Dist.).

May 7, 1970 on Motion for Rehearing.

Lloyd C. Martin, Huntsville, Clark, Thomas, Harris, Denius & Winters, Martin Harris, Mary Joe Carroll, Austin, for appellant.

Salazar & Benavides, Felix Salazar, Jr., Edward Benavides, Houston, for appellee.

## On Motion for Rehearing

BELL, Chief Justice.

The opinion heretofore rendered by us is withdrawn and the following is substituted as the opinion of the court, in view of the decision of the Supreme Court of Texas in the case of Barshop v. City of Houston, 442 S.W.2d 682.

This appeal involves an eminent domain proceeding. The case below arose when appellee filed suit against appellant seeking a declaratory judgment that appellant had no authority to take appellee's 4.375 acre tract, which was located adjacent to the Lake Livingston Reservoir in Trinity County, about four miles south of the City of Trinity, for park or recreational purposes. The suit also sought to have declared invalid a resolution of January, 1966 passed by the Board of Directors of appellant by which the Board designated land, including appellee's, that appellant intended to condemn for park purposes. This resolution had been recorded in the office of the County Clerk of each county where any of the land lay in February, 1966. The suit sought to cancel the resolution and its record as a cloud on appellee's title.

Alternatively, appellee sought a judgment declaring that if it be determined that appellant had authority to take the property for recreational purposes, such taking be considered a second taking and that the value be determined on a basis of its enhanced value caused by the construction of the dam that created the Lake Livingston Reservoir. His theory is that the original public improvement contemplated only the water reservoir and the project to create recreational facilities came after the commencement of the construction of the dam and reservoir project and consequently there was an enlargement of the project and he is entitled to the enhancement in value caused by his land being adjacent to, but not within, the area encompassed within the limits of the original project. This suit was filed March 20, 1968.

Appellant in addition to its answer to appellee's petition filed a cross-action to condemn appellee's land for recreational purposes. The cross-action was filed June 25, 1968.

We need only notice that the trial court after trial without a jury held against appellee except as to his contention that the taking of his land for recreational purposes was a second taking and allowance was given for the enhancement in value caused by adjacency to the Lake Livingston Reservoir on the date of taking. The court's

judgment, among other recitals, contains this one:

"* * * the taking of the land for public or recreational purposes constitutes a second taking when considered in relation to the original dam and reservoir as reflected in the initial contract between the Trinity River Authority of Texas (We will hereafter use the term 'appellant' or 'TRA') and the City of Houston, as reflected in Exhibit B, Stipulation of Facts, and the modified contract shown as Exhibit C; and, that the * * * described land * * * is being acquired * * * for public recreational or park purposes as distinguished from dam or reservoir purposes." (We will hereafter refer to the City of Houston as City.)

Judgment was rendered giving title to TRA and a recovery to appellee of $13,125.00. This amount represented the value enhanced as a result of the original Livingston Dam and Reservoir project because the court held the taking to be a second one. The court found that without such enhancement the value would be $1,312.50.

Appellant asserts these three points of error: 1. The error in holding as a matter of law that the taking was a second one entitling appellee to compensation based on the enhanced market value resulting from the Livingston Dam and Reservoir Project. 2. There is no evidence to support the trial court's finding that the taking for park purposes constituted a second taking. 3. The court erred in entering judgment based on the finding of enhanced market value of $3,000.00 per acre rather than the finding of $300.00 per acre as the value exclusive of the Lake enhancement.

The parties entered into a "Stipulation of Facts" and made a part thereof the contract between the City and TRA dated September 14, 1959, which is referred to as Exhibit B, the contract between the City and TRA dated September 2, 1964 which is referred to as Exhibit C, and the resolution of the Board of TRA dated January 21, 1966 designating land to be taken for recreational purposes. It is referred to as Exhibit D. Exhibit A is the contract between the City and Brown & Root dated August 6, 1957.

The Brown & Root contract provided that firm should make a study and prepare a report evaluating the future needs of the City for water, determine the available supply of surface water, and make recommendations as to the available source that should be developed. On November 6, 1957, Brown & Root recommended that the City construct the "Lake Livingston Reservoir on the Trinity River in Polk, Trinity, San Jacinto and Walker Counties" as soon as practicable. Nowhere in the record do we find such report, nor do we find any information as to just exactly where the dam necessary to create the reservoir was to be located on the River.

TRA was created as a reclamation and conservation agency in 1955 by the passage of Vernon's Ann.Civ.St. article 8280-188 by the State legislature to conserve and develop the water resources of the Trinity River. It was given authority to enter into contracts with other agencies including municipalities. Section 5(h) of the Act provides in part that "for encouragement and development of recreational facilities * * * the Board of Directors shall have the power and *duty* to acquire sufficient additional land adjoining any lakes constructed on the Trinity River for the purpose of developing recreational facilities * * *" This section then states the Board shall use its discretion in the amount of land to be acquired for a suitable recreation park but shall acquire approximately 20% of the adjoining lake front. It is stated, however, that this 20% is merely intended as a guide and shall not be construed as a maximum or minimum limitation. Section 25(a) gives TRA the right of eminent domain including the right to acquire land above the probable high water line around any reservoir.

On September 14, 1959 the City and TRA entered into a contract for mutual

cooperation and effort in the construction of the Livingston Reservoir. This contract, among other things, provided that the parties, who at this time had rival applications for water permits pending before the Texas Water Commission, would join in seeking a permit to take water from the Trinity and that the rights under the permit would be held to the extent of 70% by the City and 30% by TRA. It further provided the City would acquire all land, easements and rights of way necessary for the Livingston Dam and Reservoir and would construct the dam and reservoir and title would be vested in TRA and the City jointly on a 30%-70% basis. Further, it provided that the City would provide funds for the Livingston project and upon receipt of the permits from the Texas Water Commission and the Army Corps of Engineers would proceed with the design and construction of the project. If the City failed to commence bona fide construction within five years after receiving the permits it would transfer to the Authority its interest in the permits and such engineering plans and other information as would be useful to the Authority. If this occurred the Authority would have five years thereafter to commence bona fide construction of the project and if it failed to do so the permits would be surrendered and cancelled and the contract would be of no further force and effect.

Throughout the contract reference is to the Livingston Dam and Reservoir. However, in Section 11 of the contract it is provided that the Livingston project shall be operated jointly by TRA and the City with each having an equal voice. Then appears the provision that "at least 6 months in advance of the date the * * * project is completed and placed in operation the *parties shall jointly prepare rules for the operation of the projects,* including, but not limited to, *recreational use* (emphasis ours), together with any future amendments which shall be approved by both the City and the Authority."

The contract provides the City shall own the right to take 70% of the water from the reservoir and the TRA 30%.

The permit from the Texas Water Commission was granted to the City and TRA jointly on October 11, 1960, dividing the water between them as above stated. The permit from the Army Corps of Engineers was also granted in October, 1960.

It is stipulated that subsequent to granting of the permits Brown & Root, engineers for the City, accomplished the preliminary engineering phase of the "Livingston Reservoir Project". Further, it was stipulated that "the normal water line of 131 feet mean sea level elevation and the areas necessary for flowage, was surveyed, staked and platted on the *main portion* of the proposed reservoir during a period generally beginning in 1961 and concluding in 1965." The "upper reaches" of the proposed reservoir were at the time of the trial in the process of being surveyed, staked and platted.

On September 2, 1964, the City and TRA entered into a new contract allegedly replacing the one of September 14, 1959. The general effect of the new contract was to reverse the positions of the parties in that TRA assumed responsibility for construction of the dam and reservoir. This included responsibility for acquiring the necessary land, easements and rights of way. Too, TRA was to finance the work. It was to receive reimbursement from the City through payment of City water revenue and purchase of water by the City. The City retained the right to purchase 70% of the water. It was stipulated that title to the dam and reservoir facilities was, by said contract, to be vested in TRA.

Section 3.1 of the new contract provides that TRA "will proceed promptly to acquire all lands, easements, rights-of-way and other property necessary for the Livingston Dam and Reservoir Project, *in accordance with law establishing and creating Authority, and in accordance with the*

*recreational policy* adopted by Authority." (emphasis ours)

Section 10.1 of the contract provides TRA shall operate all recreational facilities, shall bear all operating cost therefor, and shall be entitled to all revenues therefrom.

Section 13.1 contains the same provision for the parties to agree on rules for operating the projects including recreational facilities as does Section 11 of the 1959 contract that we have above noticed.

Correspondence in the files of TRA indicates that some preliminary consideration was given to recreational areas around Livingston Reservoir as early as 1962, but it was not until December 28, 1964 that the Executive Committee of the Board of Directors of TRA authorized its consulting engineers, Forest and Cotton, Inc., to plan the recreational aspects of the Livingston Reservoir.

June 1, 1965, TRA sold and delivered bonds in the amount of $48,500,000.00 for the construction of the Dam and Reservoir.

In August, 1965 Forest and Cotton, Inc. completed for TRA a "Report on Master Plan for Recreational Development" on the Livingston Reservoir. One of the park sites included encompassed appellee's land. While the report was dated in August, it was submitted to TRA the middle of September. Testimony offered at trial showed the engineers determined 3,000 acres was the minimum need for recreational park sites. TRA's witness, Mr. Steele, did not know when the plan was made public. There is no evidence showing when it was made public until the resolution of January, 1966 was recorded with the appropriate county clerks during February, 1966. This resolution described the land to be taken for parks.

This master plan reflects that the dam was to be located about seven miles southwest of Livingston or, as reflected by the TRA resolution of January, 1966, seven miles north 65 degrees east of the court-house at Cold Springs. These two references are the only ones we find in the record specifically locating the site of the dam. We assume, however, the proposed site had been at least unofficially selected as early as 1961 because of the surveying and staking for the reservoir that was commenced in 1961. The shoreline of the reservoir would have a length of about 460 miles. At the contemplated elevation of 131 feet of the water in the reservoir, the lake would cover some 82,250 acres. The lake would be about 49 miles in length. It shows that the recreational park sites included in the 3,000 acres designated in the plan are located at various points on the lake. The report also reflects that after the use of these designated park sites there will be numerous areas along the shoreline available for private development. We are not informed as to the total mileage along the shoreline that is to be used by the recreational facilities designated by the plan. The effect, however, of the report is to show that there was very extensive land along the shoreline of the lake available for recreational purposes other than the 3,000 acres designed by the engineers' master plan and the resolution of January, 1966.

It was agreed that the City never took any land in connection with the project. The short statement of facts reveals that the City abandoned whatever it was doing September 2, 1964. The stipulation is not that the contract of September 14, 1959 was abandoned but that the City on September 2, 1964 abandoned what work it was doing.

Paragraph 21.2 of the September, 1964 contract reads as follows:

"The above mentioned contract dated September 14, 1959, shall remain in full force and effect unless and until all of the following conditions exist:

"1. All permits required of the Texas Water Commission have been secured.

"2. This agreement becomes fully binding on both parties.

"3. The initial issue of Bonds shall have been approved by the Attorney General of Texas."

As above noted the necessary permits had been obtained in October, 1960. We take it that this contract could not become binding on the City until its approval by a vote of the voters of the City as contemplated by paragraph 21.1 of the 1964 contract and as required by Article II, Sec. 7(b) of the City Charter and Article 1109e, V.A.T.S. It was stipulated that this election was held and the contract approved, but just when we are not informed. The bonds were issued by TRA June 1, 1965 after the Supreme Court on January 20, 1965 had directed their approval. See Trinity River Authority of Texas v. Carr, Tex., 386 S.W.2d 790. Appellee says, therefore, the 1959 contract was not abandoned when the 1964 contract was executed.

On September 1, 1965, the Tribunal for Condemnation was appointed. Subsequent to this appointment TRA commenced to acquire land upon which the dam and reservoir were to be located, and also land immediately adjacent thereto.

April 14, 1966, bids for the construction of the Livingston Dam were opened, and a contract was awarded. Shortly thereafter work was commenced and has continued since.

It was stipulated that since condemnation commenced in 1965 land acquisition for purposes of the "Livingston Reservoir Project" had continued on a sustained and diligent basis. Acquisitions have been made by condemnation and voluntary purchase. "A total of approximately 85,000 acres in fee and approximately 11,500 acres in easements are to be acquired for all purposes of the Livingston Reservoir Project, including therein rights-of-way for relocation of highways, pipe lines and utilities." As of March 1, 1968, approximately 62,000 acres in fee and 5,000 acres in easements had been acquired.

It was also stipulated that TRA intended to condemn appellee's property for recreational purposes and had made an offer to purchase. The price offered was based on appraisals made of the fair market value, exclusive of the direct enhancement received by said land by reason of its being located and fronting upon the proposed Livingston Reservoir.

The testimony of Mr. T. A. Cauthen, the real estate expert, shows that without considering the 131 foot level established for the reservoir, the land is located approximately 500 feet from the bank of the Trinity River and approximately 2,000 feet west of State Highway 19. As so located its highest and best use was for recreational purposes. Its value, uninfluenced by Lake Livingston Project was placed at $300.00 per acre or a total for the tract of $1,312.50. When the 131 foot line is considered the tract would front on the lake. Its highest and best use would also be for recreational purposes. However, since it would front on the lake, its value has been enhanced so that the fair market value at the time of condemnation would be $3,000.-00 per acre or a total value of $13,125.00.

The basic position of appellee is that the acquisition of lands for recreational purposes was not included in the initial project, that is, the construction of the Livingston Reservoir, but the taking for recreational purposes was an enlargement of the initial project and it was, therefore, an additional or "second taking" which entitled him to the enhancement in value due to the construction of the Livingston Reservoir. This contention was sustained by the court. The value was determined on a basis of the fact that the Reservoir would make the land water front property. This contention is based on the theory that the initial project was that provided for in the contract of September 14, 1959; that this project was carried forward by the contract of September 2, 1964, but under the latter contract the initial project, which encompassed only a reservoir, was enlarged so as to include land for recreational pur-

poses; that even under the 1964 contract practically all land had been acquired for the dam and reservoir before TRA had by its Board's action definitely determined to take any land for park purposes.

The appellant contends in effect that the contract of September, 1959 was superseded in its entirety by the contract of September, 1964, so that there was an entirely new project which encompassed the acquisition for recreational purposes. It says, in effect, there had been no definite commitment under the first contract because no land had been taken. Its contention is that since the September, 1964 contract encompassed the taking of land around the reservoir, but only at points to be selected, the test to be used in determining whether appellee is entitled to the value of the land enhanced by its being on the lake is whether it was under all facts probably to be taken. Its position is that the court determined as a matter of law that it was a second taking and did not in so determining consider whether appellee's land was prior to its specific designation probably to be taken. Appellant relies principally on the case of United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55. Appellee relies upon the following cases: State v. Vaughan, Tex.Civ.App., 319 S.W.2d 349, n. w. h.; City of El Paso v. Coffin, 40 Tex.Civ.App. 54, 88 S.W. 502, error dism.; Housing Authority of the City of Dallas v. Hubbard, Tex.Civ.App., 274 S.W.2d 165, n. w. h.; State v. Parrish, 159 Tex. 306, 320 S.W.2d 330, and City of Dallas v. Rash, Tex.Civ.App., 375 S.W.2d 502 ref., n. r. e.

We are of the view that the trial court was in error in holding that acquisition of land for recreational purposes was not included in the project as defined in the 1959 contract between the City and TRA, but that such a purpose was included for the first time in the 1964 contract between the parties.

Under the 1959 contract the City was the condemning authority for the *joint* project but title to the land acquired was to be vested in TRA to the extent of 30%. The project was a joint one undertaken pursuant to authority conferred by the statute above cited. Section 5(h) above cited makes it the *duty of TRA* to acquire for recreational purposes additional lands adjoining any lake constructed by it on the Trinity River. While the 1959 contract specifically mentions recreational facilities only where it provides the parties will, six months prior to placing the projects in operation, jointly prepare rules for the operation of the projects, we feel that the statute became a part of the contract. This placed the duty on TRA to provide recreational facilities. Empire Gas and Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265; Von Hoffman v. Quincy, 71 U.S. (4 Wall.) 535, 18 L.Ed. 403.

The question arises as to whether in determining the market value of appellee's land any enhancement in value can be considered due to the fact that the project was proposed to be located at some unspecified point on the Trinity River so the reservoir would inundate lands in Trinity, Walker, San Jacinto and Polk Counties and recreational sites at various unspecified points along the reservoir extensive shoreline would be acquired.

The general rule is that the market value is determined as of the date of taking which in this case was July 15, 1968. Barshop v. City of Houston, 442 S.W.2d 682 (Tex.). Another general rule is that the value should not include any enhancement which is occasioned by the public facility itself. Morrow v. St. Louis, A. & T. R. Co., 81 Tex. 405, 17 S.W. 44. As stated in Barshop, however, this rule of exclusion is subject to certain exceptions as in "cases in which the land taken was not within the original scope of the project, but was needed for expansion or for purposes which might be regarded as incidental to the project, and cases in which the general location of the project is fixed, but the exact location or the extent thereof is uncertain."

■ Here, in the light of our holding above, the first exception is inapplicable. The second exception we hold to be applicable.

In Barshop, the Supreme Court discussed City of Dallas v. Shackelford, 145 Tex. 528, 199 S.W.2d 503, and in part stated as follows:

"City of Dallas v. Shackelford stated a rule or test for fixing the valuation date in instances of delayed, separate, or uncertainty of taking and also stated certain factors it considered in applying the test. It announced the rule that the valuation date was the date of taking and the valuation properly included benefits and enhanced value as a result of improvements up to the time the City manifested a definite purpose to take the land. Several factors aided the court in arriving at its conclusion. City of Dallas did not designate the additional eight blocks for immediate acquisition, the lands were not to be presently taken, there was a state of uncertainty about when, if ever, the City would take the property, there were separate proceedings to take the property in stages, and the proceedings were not begun simultaneously in a common proceeding. The court held Dallas did not manifest a definite purpose to take the additional property until November of 1944 and approved the allowance of evidence about enhanced value up to January 4, 1945, the date of the taking."

■ We think the effect of Barshop is to hold that in such cases general enhancement in value of the property in the neighborhood in anticipation of the proposed improvement may be included in the determination of the market value as of the date of the taking. When the site of the improvement is determined but the exact extent of lands necessarily to be encompassed in the facility are not known, the general increase in the market value of land in the neighborhood due to the proposed facility may be considered until such time as it becomes certain that the particular tract will be taken.

In the case before us the evidence concerning general notoriety about the location of the facility is almost entirely wanting. This is probably true because of the theory on which the case was tried. However, in August, 1957 Brown & Root was authorized to make a survey for available sources of water supply for the City. It made its report in November, 1957, recommending a reservoir somewhere on the Trinity River. From the facts we have previously detailed we know there was continuous activity in connection with the project and notoriety about it must have been abroad that would affect values in the neighborhood of its location. Such general enhancement in value, if any, may be considered until such time as it became certain that the tract would be taken. Further, after the dam site was located and main surveying was done for the reservoir there were several thousand acres along the shore that were available as park sites. However, how many sites would be acquired and their location was uncertain. The fact that it may have become a water front lot may not be considered, but the enhancement in value is limited to general enhancement in value of lands in the neighborhood of the facility.

In the case before us until TRA adopted its resolution in January, 1966, there was a continuing state of uncertainty as to when, if ever, the appellee's tract would be taken, as an analysis of the facts we have recited above will reflect.

We express no opinion concerning whether there was in fact any enhancement in value.

Appellant's motion for rehearing is granted and the case is reversed and remanded.