# IN THE SUPREME COURT OF TEXAS

════════════

No. 10-0950

════════════

ENBRIDGE PIPELINES (EAST TEXAS) L.P., PETITIONER,

v.

AVINGER TIMBER, LLC, RESPONDENT

══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS

══════════════════════════════════════════════

**Argued February 27, 2012**


JUSTICE JOHNSON, joined by JUSTICE GREEN and JUSTICE WILLETT, dissenting.


The Court, focusing on a report by Avinger's appraisal expert David Bolton that was not introduced into evidence at trial, concludes "[i]t is apparent that Bolton was not valuing the 23.79 acres improved by the pipeline infrastructure that Avinger lost, but rather the gas processing facility that Enbridge Pipelines gained," and his testimony "impermissibly focused on the benefit to Enbridge Pipelines in avoiding the cost of removing the plant." ___ S.W.3d at ___. I disagree that Bolton's testimony supports the Court's statement. I also disagree that the trial court abused its discretion by admitting the portion of Bolton's testimony related to Enbridge's contractual obligation to remove its plant. Bolton testified that the Uniform Standards of Professional Appraisal Practice (USPAP) and Texas law required him to consider the effect of the lease provision requiring Enbridge

to remove its plant within six months after the lease expired, and he did. However, in his trial testimony, which is the issue here, he did not assign any value to that obligation. Rather, he valued only Avinger's land without Enbridge's plant on it, and clearly based his opinion of market value on accepted income and comparable sales methodologies. I respectfully dissent.

## I. Background

Beginning in 1973, predecessors in interest of Enbridge Pipelines (East Texas) L.P. (Enbridge) leased 23.79 acres of East Texas land (the property or the leased property) from the predecessors in interest of Avinger Timber, LLC (Avinger). In 2001 Enbridge Processing, an affiliate of Enbridge, acquired the lessee's interest in the Avinger lease, which had been renewed in 1998 and expired on April 2, 2004. During the 31 years the lease was in effect, a "mid-stream" gas processing plant was built on the property and environmentally permitted for processing operations, and infrastructure supporting operation of the plant was put in place. There is no dispute that (1) the Avinger lease expired on April 2, 2004; (2) the date of taking was April 7, 2004; (3) millions of cubic feet of raw natural gas flowed through fifteen or sixteen pipelines into Enbridge's plant for processing on a daily basis; (4) high voltage electrical lines had been built through surrounding raw timberland to supply electricity to the plant; (5) environmental permits were in place for operation of the gas processing plant; (6) the property is in one of the most prolific gas-producing counties in Texas and the field was predicted to produce until at least "the end of the century;" and (7) Enbridge was contractually required to remove its plant no later than six months from the date the lease term expired.

## II. Standards

A landowner whose property is taken by condemnation is entitled to compensation in the amount of its market value, which is the value to a willing buyer under no compunction to buy and to a willing seller under no compunction to sell. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001).[1] But the amount of compensation is determined by what is taken from the landowner, not what the property's special value might be to the taker. *See City of Dallas v. Rash*, 375 S.W.2d 502, 505 (Tex. Civ. App.—Dallas 1964, writ ref'd n.r.e.) (citing *United States v. Milner*, 317 U.S. 369 (1943)). Bolton testified, and the parties do not dispute, that appraisers must consider every factor affecting a property's value when they appraise condemned property to determine its market value. That stands to reason because fact finders are to consider all factors that affect the property's value to willing buyers and sellers when they determine the market value of property taken through condemnation proceedings. *City of Ft. Worth v. Corbin*, 504 S.W.2d 828, 830 (Tex. 1974). Furthermore, Bolton testified that the USPAP requires appraisers to consider the effect on a property's value of lease or contractual agreements to which the property is subject and that Texas law requires appraisers to abide by those standards in making appraisals. *See* TEX. OCC. CODE §§ 1103.002, .005, .154, .201, .405.

---

[1] The jury charge defined market value as follows:

> The term "MARKET VALUE" means the price which the property would bring when it is offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying it, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future.

3

### III. The Testimony

### A. Donald Niemiec

Donald Niemiec was one of Avinger's witnesses. Before he retired, Niemiec worked in the mid-stream gas processing business for many years in several capacities for several companies, including managing multiple gas processing plants. He had been involved in valuing and selling mid-stream processing plants and was familiar with the factors affecting the value of such plants in the marketplace. After retiring, Niemiec continued working as a consultant in the industry and served on several industry committees related to the gas processing business. He testified that the property was special because of the infrastructure in place to support a gas processing plant, its location in a long-lasting and highly-productive gas field, and its established history of processing gas in that area. He characterized it as "unique" because of the lease provision requiring Enbridge to remove its plant after the lease terminated. He opined that many companies in the processing business would be interested in the property as it was on April 7, 2004 because of the cost savings inherent in the existing infrastructure and the opportunity for whoever owned it to capture the gas processing business in the area.

Niemiec had examined records produced by Enbridge and testified (without contradiction by Enbridge) that a plant on the property would process approximately 80 million cubic feet of gas per day, produce projected earnings from the liquids portion of that processing before interest, taxes, depreciation, and amortization (EBITDA) of $16,500,000 per year, and have additional income from other fees a plant operator would typically charge its customers. Industry standards for valuing processing plants ranged from 10 to 14 times EBITDA, so $16,500,000 in annual EBITDA would

yield a value of $165 to $231 million for the property with a plant on it. Niemiec estimated the property, absent Enbridge's plant, would be worth $18 to $22 million to a buyer who could build a new plant on it for $50 to $52 million, secure the projected $16,500,000 EBITDA, and own an asset valued at $165 to $231 million that was producing annual EBITDA of approximately 22% to 23% on invested capital. His valuation was based only on the property's projected ability to produce an income stream:

> Q: What do you think you and a group of investors in 2004, if you had known the site was leased and that the lease was expiring, would have been willing to pay for the 23.79 acres involved in this lawsuit?

> A: Having worked with a number of investors like Warburg Pincus and JP Morgan and various things, they have pools of money looking for investments. And what I said in my report, knowing what I know about the site and the lease, that we would be willing to put up a minimum of $18 million for the site knowing that this lease is expiring and knowing, as a knowing buyer, what I know about would have to be done to move this plant per the lease.

> Q: And did you say earlier that the range you thought was reasonable, from looking at it from that point of view, was 18 to 22 million?

> A: Yes.

> Q: Okay. Let's assume that you had to pay the highest price, 22 million for the land. And how much would it cost to build a new plant on this site that's already permitted and everything, got all the stuff going on?

> A: Well, it would be less than the $50 million . . . it would be less than the $52 million than [sic] I had before, so . . . .

> Q: What number, 51 million?

> A: 50.

> Q: One-and-a-half. So you would have 72 million in it, right?

A: Yes.

Q: If you bought it for the cheapest, 18 million, you'd have - 18 plus 50 would be 68 million, and have a new plant sitting on this site; is that right?

A: Yes, 68 million.

Q: Would that tend to be a valuable proposition for any buyer?

A: Yes. It cost you - it'd cost you 68 million, and you've got a value in the plant of 165 to 231 [million]. So that would be a valued proposition that somebody would want to do . . . .

Q: Okay. I'm told by my lawyer that I didn't make it clear that the 18 to 22 million is for the land only.

A: Yes.

Q: Not talking about you buying the old plant. And so if you bought the land only and the old plant went away, so you built you a brand new plant, you would still have between 68 and $72 million total in the property, depending on the range you paid for the land, 18 to 22, right?

A: Yes.

Q: Explain to this jury - maybe you have, but one more time, why would it make economic sense for anybody in the gas processing business to pay between 18 and $22 million to buy this site if - let me back up.
If a tornado came along on April 6th at 11 o'clock at night and wiped this plant out, what kind of money would you be willing to pay, UP Fuels, people in the industry, for this site, even if the plant is gone?

A: The - I'd still pay the 18 to $22 million.

Q: Why?

A: The way I think about it - and we can use the tornado, but that's a way to just kind of lift it up and take it out of there so that we have the land at that time vacant. But the pipeline is coming in; the pipeline is going out; the air permits; the electrical power that's there; the customers are all still there. So I would simply put a plant in

6

there. I would have to spend the money to do that, the $50 million, but the earnings off of these plants is enough to justify that.

Q: Did you explain all of this to David Bolton?

A: I did.

. . . .

Q: Would anybody knowledgeable in this business, in the gas processing business, anybody understand that it's a heck of a bargain to buy this tract in . . . Avinger, Texas . . . to capture this kind of value and this kind of annual income? Even if it is in Marion County?

A: They would--they would understand that, and they would see the value in that.

The above passage, among others, makes it clear that Niemiec based his opinion of value on the property without Enbridge's plant on it, and that his opinion did not take into account any value for Enbridge's plant, Enbridge's cost to remove the plant, or the property's special value to Enbridge.

## B. David Bolton

The Court says that in his appraisal report Bolton "concluded that a prudent and knowledgeable investor, considering Enbridge Pipeline's cost savings, would pay between $21,750,000 and $28,500,000 for Avinger's interest" and that "[t]he only interest that should have been appraised was Avinger's interest in the land. However, . . . this was not the interest that was valued in Bolton's report." ___S.W. 3d at ___. But Bolton's report was not introduced into evidence at trial. The valuation testimony the jury heard from Bolton was that the market value of the property was $20,955,000 if the Enbridge plant did not exist or had been "swept away by a tornado." That value did not include any amount attributable to the plant, Enbridge's obligation to remove it, or cost savings to Enbridge if it did not have to remove it. Bolton specifically testified

7

that he appraised the tract and formed his opinion of its market value based on "typical market participants," and not on its special value to Enbridge as the taker, or its value to Avinger as the seller:

> Q: Now, is the - in the definition [of market value], it asked about the price of a seller willing to sell and a buyer willing to buy. Is it the value to Avinger Timber or the value to Enbridge Pipeline Company that you're trying to appraise?
>
> A: No. We're appraising the value of the property.
>
> Q: And is it the value to that mythical seller in the definition whose name is not given and the mythical buyer?
>
> A: It's to typical market participants.
>
> Q: Do you know why, in the definition of appraisal, that it doesn't set forth the particular value to the owner or the particular value to a specific person?
>
> A: Well a value to a particular person or a particular entity may have something special over and above or less than typical market participants. So that may be a value to that person, but it wouldn't be a value in exchange.

Just as Niemiec did, Bolton explained that the site was valuable because of its physical location in a highly productive gas field, the existing pipeline infrastructure that included fifteen or sixteen pipelines through which gas arrived at the site for processing, the existing electrical supply to the property, and the fact that the site was already permitted for operation of a gas processing plant. His opinion was that the property would be an attractive investment for gas processing businesses because it would allow a buyer to begin processing gas at least a year sooner than if the buyer purchased a new site, obtained permits for it, and constructed a new plant. Further, a buyer of the property would not have to contend with the creation of a pipeline infrastructure for a new

8

processing site or start competing for customers. His testimony of $20,955,000 value was based on two separate income analyses and a comparable sales analysis.

Niemiec and a consultant named Jeff Spearman[2] provided Bolton with cost estimates for Enbridge to remove its plant and relocate it to another site. The minimum estimated cost for Enbridge to do that was $29 million which included building a temporary plant on the property to process a reduced amount of the gas received at the property while Enbridge located, acquired, and permitted a new site, then moved its existing plant. The temporary plant scenario was discounted by Niemiec as a poor choice at best because it would reduce Enbridge's processing revenue significantly and disrupt operations of the producers supplying gas. Bolton understood from Niemiec that under the best and most viable scenario for Enbridge, if it did not buy the property or execute a new lease with Avinger at market rates, it would incur a minimum $38 million cost. That cost included Enbridge leaving the existing plant where it was and continuing to process gas at a normal rate while it built another plant close by and then selling the existing plant for salvage. Leaving its plant in place and building a new one would allow Enbridge to continue capturing the full amount of revenue from the gas processing business while it transitioned to a new plant—a time estimated to be at least 12 months and likely 18 to 24 months—and would avoid disrupting the business of its gas suppliers and incurring their ill will as well as losing some or all of the revenue for processing gas. This latter scenario apparently was the most probable from Enbridge's point of view, also. Avinger presented the testimony of Kyle Hart, who worked in management at Enbridge's

---

[2] Spearman worked for a consulting company that specialized in mid-stream gas processing.

plant. Hart testified that it would have cost Enbridge an estimated $20 million to move the plant and that cost made moving it prohibitive.

The only value testimony Bolton gave relating to cost savings to Enbridge was that the value of the property to Enbridge would have been much greater than the $20,955,000 he concluded was its market value absent the plant. In giving that testimony Bolton did not refer to the higher appraisal numbers in his report, even though at one point he was specifically asked about the property's value to Enbridge as opposed to its value to a third party buyer. His opinion was that it would be greater to Enbridge because of Enbridge's cost savings:

Q: If you had been asked in this case -- if this were not a condemnation case, but you were asked to do an appraisal of what the value of this property was to the tenant, would it have been more or less than your opinion of the value to a willing buyer?

A: No. It would have been more.

Q: And explain to the jury why you say that.

A: Well, their cost savings would be something like $38 million if -- considering the lease and considering their position to construct a new land [sic] less the salvage. And I believe Mr. Niemiec's numbers are $38 million. I think that would represent that scenario.

Q: Focusing you on other buyers -- not Enbridge, focusing you on other buyers, are the Enbridge costs to relocate the plant or the tenant costs to relocate the plant relevant to those other buyers?

A: Sure.

Q: Why? Can you explain that to the jury?

A: Sure. Because anyone looking to buy this is -- and the lease was terminating, and they - and if the tenant had to move, then they're faced with relocating at a net cost of at least $38 million. Well, if a prospective buyer can come in because of the location . . . of the pipelines and because of the amount of actual business that goes

through that site, would -- any dollar amount that they can buy that for substantially less is going to be a factor they consider, I think.

## C. Discussion

The Court takes issue with Bolton's consideration of Enbridge's contractual obligation (and right) to remove its plant under the lease agreement. But Bolton's uncontradicted testimony was that the USPAP requires appraisers to "analyze the effect on value, if any, of the terms and conditions of [any] lease." In his opinion the lease provision giving Enbridge six months to move its plant was a factor affecting the value of the property that not only *could* be taken into consideration, but *had* to be taken into consideration under the USPAP and Texas law because it would affect the value to a hypothetical willing buyer. As reflected by the testimony quoted above, Bolton's opinion was that a willing buyer would factor Enbridge's relocation costs and the potential for purchasing Enbridge's plant into the property's value. Because such a buyer would consider that factor, he was bound to consider it in appraising the property's value. But he never testified to a value for that factor. His testimony was clear that his opinion of the property's market value without Enbridge's plant on it was $20,955,000, and that value was based on accepted methods of appraising properties by using sales comparisons and the property's projected ability to produce income—not its value to Enbridge because of the cost savings Enbridge could obtain by purchasing the property, nor the value of the Enbridge plant. On the other hand, as a licensed appraiser he could not ignore the fact that for up to six months after the lease expired on April 2, 2004, a purchaser's use of the property was subject to the presence of the plant, Enbridge's right and obligation to remove the plant, and the effects of those on the property's market value. In his testimony Bolton detailed his investigations and the

11

bases for his calculations and opinion. Donnie Sherwood, an appraiser hired by Enbridge, testified clearly that he had no basis to criticize Bolton's methodology or his conclusions.

The Court does not criticize Bolton's methodology or the information underlying his opinion. Nor does the Court point to any portion of Bolton's testimony showing that his opinion of the property's market value included any amount for "the gas processing facility that Enbridge Pipelines gained." Manifestly, any potential buyer of the property would assess all aspects of it before investing: it was rural East Texas timber land except for its being the site of a longstanding gas processing operation with particular attributes and advantages. Under the USPAP and Texas law, Bolton could not ignore the effect of Enbridge's lease rights and obligations on the property's market value. The property was burdened by those; they affected the ability of any potential purchaser to use the property as well as provided an opportunity for decreasing the costs necessary to purchase and make the property profitable by possibly purchasing Enbridge's plant for less than the cost of building a new one. Bolton would have been blinking reality, as well as violating his professional obligations, if he disregarded the effect of the lease terms. Certainly the potential cost savings to a buyer could fail to come to full fruition if, after the buyer purchased the property, Enbridge dismantled and moved its plant instead of selling it to the buyer for a price lower than the cost to build a new plant. But that is the nature of business risk: potential cost and profit drive the price of any business property.

Even though Bolton considered the lease and its terms, there was no evidence he put any amount into his $20,955,000 valuation of the property because of the costs to Enbridge to remove the plant. His report might have included value in its figures based on Enbridge's obligation to move

12

its plant and cost savings if it did not do so, but those figures were not referred to or used at trial by Bolton or Avinger. Despite the Court's characterization of his testimony otherwise, he never wavered from the position that his testimony to the jury about the property's value was based on its market value as a tract without Enbridge's plant on it, not its value with Enbridge's plant on it, the property's special value to Enbridge, or Enbridge's cost savings if it purchased the property and did not have to move its plant.

## IV. Conclusion

For the reasons expressed above and those expressed by the court of appeals, I agree with the court of appeals that Bolton's opinions did not violate the value-to-the-taker rule and that his valuation opinions were not speculative. 326 S.W.3d 390, 406-08, 411. His opinions were based on two different income analyses that he properly supported and a comparable sales methodology that he fully explained. Moreover, as explained by the court of appeals, his opinions did not violate the project-enhancement rule. *Id.* at 408-10.

I agree with the Court that the trial court did not abuse its discretion by excluding Albert Allen's testimony because he improperly valued the land as vacant rural residential property.

I would affirm the judgment of the court of appeals.

_____
Phil Johnson

13

Justice


**OPINION DELIVERED:**  August 31, 2012