

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

———————————————

No. 06-09-00046-CV

———————————————

ENBRIDGE PIPELINE (EAST TEXAS) L.P., Appellant

V.

AVINGER TIMBER, L.L.C., Appellee

On Appeal from the 276th Judicial District Court
Marion County, Texas
Trial Court No. 0400066

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

## I.     INTRODUCTION

Is the value of a bare and undeveloped tract of rural real estate equivalent to the value of rural real estate that (1) has been leased by the owner to several gas companies for over thirty years as a gas processing plant, (2) has more than fifteen pipelines entering the property, and (3) has all the proper permits for use as a gas processing plant?  The condemnor, Enbridge Pipeline, argues yes.  We disagree.  We do not believe the bare real estate tract is equivalent to the tract involved here.  From that conclusion, we find the appraiser for the landowner was properly allowed to testify, and the appraiser for the gas company was properly excluded.  We will affirm the judgment of the trial court.

Enbridge Pipeline, L.P. (Pipeline) appeals a jury's $20,955,000.00 condemnation award to Avinger Timber, L.L.C. (AV).  Pipeline alleges the trial court erred in:  (1) denying its *Daubert/Robinson*[1] motion against AV's valuation expert, David Bolton; (2) striking its expert, Albert Allen; (3) denying its motion for directed verdict and motion for judgment notwithstanding the verdict; and (4) failing to submit its proposed jury instructions.  We determine the trial court was within its discretion in admitting Bolton's testimony regarding fair market value of the condemned property, while excluding Allen's testimony for his use of improper methodology.

---

[1]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *E.I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

2

Due to our determination of these dispositive issues, and Pipeline's failure to preserve any alleged error in the jury charge, we affirm the trial court's judgment.

## II.    FACTUAL AND PROCEDURAL HISTORY

The main issue in this case is the fair market value of AV's land on the date it was condemned by Pipeline. The history of this land is essential in understanding the experts' valuations. The condemned land has been owned by the Simpson family and their company, AV, since the mid-1950s. In 1973, Roland Simpson leased 23.79 acres out of his 418-acre property to Tonkawa Gas Processing Company[2] for the purpose of building and operating gas processing facilities. The first lease "was a 10-year lease with a renewal after every 10 years for another 10 years" as a continuing option, which indefinitely postponed AV's right of reversion. Annual rent for the land was $500.00.[3] Tonkawa built a large natural gas processing plant atop the land in 1973.[4] Fifteen or sixteen separate natural gas pipelines owned by various companies were connected to the plant over the years, and the site became a known processing hub.

Tonkawa renewed the lease in 1984, for fifteen years, on the same terms, except that rent was increased to $4,000.00 per year. Evidence was presented that the Simpsons did not have a

---

[2]Tonkawa was a private company without the power to condemn.

[3]At the end of the term, Tonkawa and Roland could agree to the amount of rent for the next year term, and absent agreement, would arbitrate the amount.

[4]The parties stipulated that all improvements under the lease belonged to the lessee. This stipulation did not include the pipelines built under easements granted to other companies.

complete understanding of what the land was worth at this time.[5] Tonkawa sold the plant to Koch Midstream Processing,[6] successor of Tonkawa's lease interest, and AV took Roland's place as successor lessor.

In 1998, these parties renewed the 1984 lease, but on different terms. First, the lease became a short, three-year term, with the first term ending April 2, 2001, with another three-year option. The annual rent increased to $22,265.00. A major difference from the earlier leases was that Koch's right of never-ending lease renewals was removed, giving AV a valuable reversionary interest in the land. According to industry expert Donald W. Niemiec, this major concession was made with the understanding that "[i]f [the amount of rent] went to arbitration . . . the rent would be quite high," approximately $2.5 million per year. He characterized the lease as "unique in that it expires. Most all processing plants own it or have a forever lease on it." Upon expiration of the three-year lease, the lessee had the option of renewing the lease, buying the land, or selling the lease and/or removing the plant. The lease was renewed in 2001 with an April 2, 2004, expiration date. Enbridge Processing (Processing) became the natural gas plant operator and successor to Koch's interest in November 2001.[7]

---

[5]According to Niemiec, the Simpsons believed the Tonkawa improvements would be valued at $1 million. In fact, they were valued at $75 million.

[6]Koch was also a private company without power of condemnation.

[7]Enbridge Processing was a private company, whereas Enbridge Pipeline is a public company having the right of eminent domain.

With the lease expiration date looming,[8] Pipeline (not Processing) sent a March 10, 2004, $35,685.00 offer to AV for purchase of the fee interest. The letter informed AV it had until 4:00 p.m. on March 12, 2004, to agree to the purchase price or face condemnation proceedings. On March 11, 2004, Processing merged with Pipeline, a public utility company, and secured the right to acquire the property through eminent domain. A petition for condemnation by Pipeline was filed on March 18, 2004. Commissioners awarded AV $47,580.00 for the condemnation after AV failed to appear at the valuation hearing. AV objected to the commissioners' default award and went to trial on one issue—the fair market value of the condemned acreage.[9]

*Daubert/Robinson* challenges were made to both parties' experts, with the main question being whether the expert was entitled to consider the gas processing plant in valuing the land underneath it. The trial court answered the question in the affirmative. Because Pipeline's expert valued the land as vacant rural residential property, the trial court struck his testimony, finding his opinion unreliable and based upon improper methodology. The court also denied Pipeline's motion to strike AV's expert and allowed him to testify because he considered all existing factors in determining the land's fair market value. After hearing AV's expert testimony, the jury found the surface interest of the condemned land was worth $20,955,000.00.

We first consider the trial court's *Daubert/Robinson* rulings.

---

[8]It is alleged that Processing and AV could not agree on a price for rent when negotiating the lease renewal.

[9]Except for challenges to experts, the record is clear that "[b]oth parties have agreed to waive all other issues in this case except for the value and damages caused by this condemnation," including Pipeline's right to the taking.

## III. THE *DAUBERT/ROBINSON* ANALYSIS

"[I]t is not permissible for the jury to consider mere speculative contingencies nor is testimony which ascends to the realm of speculations and fancies that may occur to the minds of optimistic witnesses concerning the future prospects of [condemned] property and its value admissible." *McChristy v. Hall County*, 140 S.W.2d 576, 578 (Tex. Civ. App.—Amarillo 1940, no writ). The trial court must act as evidentiary gatekeeper to screen irrelevant and unreliable expert evidence. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). It has broad discretion with respect to this function. *Id.*; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *In re Estate of Trawick*, 170 S.W.3d 871, 874 (Tex. App.—Texarkana 2005, no pet.). In determining whether an abuse of discretion occurred in the inclusion of Bolton's testimony and the exclusion of Allen's, we look to see whether the trial court acted without reference to guiding principles or rules. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We cannot conclude that a trial court abused its discretion merely because we would have ruled differently. *Id.* at 242; *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 932 (Tex. App.—Texarkana 1997, writ denied).

### A. Standard of Review

In addition to demonstrating that an expert witness is qualified, the expert's testimony must be relevant to the issues in the case and based upon a reliable foundation. TEX. R. EVID. 401; *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *Zwahr*, 88 S.W.3d at

6

628; *Robinson*, 923 S.W.2d at 556 (citing *Daubert*, 509 U.S. 579). The parties do not dispute the qualifications of either witness. Thus, we look to relevance and reliability.

Rule 702 of the Texas Rules of Evidence states that if "technical, or other specialized knowledge will assist the trier of fact to understand the evidence to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. In *Kumho Tire Co. v. Carmichael*, the United States Supreme Court suggested that the *Daubert* standard is flexible and that the trial court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. 137, 152 (1999). Expert testimony is unreliable if it is not grounded in "the methods and procedures of science," and is no more than "subjective belief or unsupported speculation," or there is too great an "analytical gap" between the data and the expert opinion offered. *Robinson*, 923 S.W.2d at 557; *Zwahr*, 88 S.W.3d at 629; *see Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997). In reviewing the reliability of expert testimony, a trial court does not determine whether the expert's conclusions are correct; rather, the court should determine only whether the analysis used to reach those conclusions is reliable. *Zwahr*, 88 S.W.3d at 629; *City of Sugarland v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 510–11 (Tex. App.—Eastland 2007, pet. denied).

"Reliability is determined by looking at numerous factors including those set forth in *Robinson* and *Daubert*." *Havner*, 953 S.W.2d at 712. These include:

> (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique.

*Id.* at 714 (citing *Robinson*, 923 S.W.2d at 557).

A certified or licensed real estate appraiser is required to comply with the Uniform Standard of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, or other similarly strict standards must be used. TEX. OCC. CODE ANN. § 1103.405 (Vernon Supp. 2010). Additionally, the appraiser should use an appraisal method which passes *Daubert/Robinson* muster. Texas courts have recognized that the comparable sales, income capitalization, and replacement cost methods meet these standards, as they have been tested, proven to require objective analysis, widely publicized, subjected to peer review, generally accepted by appraisers, and utilized in appraisals outside of the courtroom. *In re Marriage of Rice*, 96 S.W.3d 642, 647 (Tex. App.—Texarkana 2003, no pet.). These methods are discussed in detail below.

If an appraiser utilizes improper methodology or misapplies established rules and principles, resulting testimony is unreliable, irrelevant, and must be excluded. *Zwahr*, 88 S.W.3d at 631 (trial court erred in allowing testimony of appraiser who improperly applied project

8

enhancement rule); *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 188–89 (Tex. 2001) (Baker, J., concurring) (trial court erred in admitting appraisal of expert who improperly utilized subdivision development analysis method of appraisal). Further, "unless an appraisal gives a value based on the land's condition at the time of condemnation -- taking into account all relevant factors that affect its valuation, including the market for its possible future use -- it is not relevant to the issue of market value." *Id.* at 185.

B.     **The Law of Condemnation and Permissible Methods of Appraisal[10]**

"Eminent domain has been described as 'one of the inalienable rights of sovereignty. It is the power to take private property for public use.'" *State v. Ware*, 86 S.W.3d 817, 821–22 (Tex. App.—Austin 2002, no pet.) (citing *Fort Worth & D.C. Ry. v. Ammons*, 215 S.W.2d 407, 409 (Tex. Civ. App.—Amarillo 1948, writ ref'd n.r.e.)). "[I]t is axiomatic that government cannot take a citizen's property without payment of the property's fair value." *Id.* at 822. Thus, both the United States and Texas Constitutions require governments to compensate landowners for takings of their property. U.S. CONST. amend. V (requiring "just compensation"); TEX. CONST. art. I, § 17 ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made."). When a government condemns real property, the normal measure of damages is the land's market value. TEX. PROP. CODE ANN. § 21.042(b) (Vernon Supp. 2010). Where a condemnor's offer for the price of land is refused, "the objective

---

[10]Pipeline accuses Texas courts of "conflating" the rules involving valuation of fair market value in condemnation cases and states the Texas Supreme Court "confus[ed] the issues involved."

9

of the judicial process under the constitution and statutes is to make the landowner whole."  *City of Fort Worth v. Corbin*, 504 S.W.2d 828, 831 (Tex. 1974); *Zwahr*, 88 S.W.3d at 628.  "The general rule for determining fair-market value is the before-and-after rule, which requires measuring the difference in the value of the land immediately before and immediately after the taking."  *Zwahr*, 88 S.W.3d at 627.

The question of market value is "peculiarly one for the fact finding body."  *Tex. Elec. Serv. Co. v. Graves*, 488 S.W.2d 135, 139 (Tex. Civ. App.—El Paso 1972, writ ref'd n.r.e.); *City of Sherman v. Wayne*, 266 S.W.3d 34, 46 (Tex. App.—Dallas 2008, no pet.).  It is "defined as the price the property would bring when offered for sale by one who desires to sell but is not obliged to do so and bought by one who desires to buy but is under no necessity to do so."  *Home & Hearth Sugarland*, 215 S.W.3d at 511 (citing *Sharboneau*, 48 S.W.3d at 182, 189).  This is called the "willing seller -- willing buyer test," which necessarily takes into consideration all factors "that would reasonably be given weight in negotiations between a seller and buyer."  *Id.* at 512 (citing *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 814 (1954)).  Where appropriate, lost profits to the condemnee as a result of the taking may also be considered.  *Wayne*, 266 S.W.3d at 45.

Because a jury can consider "all uses for which the property is *reasonably* adaptable and for which it is (or in all reasonable probability will become) available within the *foreseeable* future" in determining market value, a condemnee is entitled to present the property's highest and

10

best use. *Home & Hearth Sugarland*, 215 S.W.3d at 511 (emphasis added); *Bauer v. Lavaca-Navidad River Auth.*, 704 S.W.2d 107, 109, 112 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) (on property containing established pipeline corridor, highest and best possible use of severed condemned land was for sale of pipeline easements). Consideration of the highest and best use "cannot be given to uses which are purely speculative and unavailable." *Home & Hearth Sugarland*, 215 S.W.3d at 511 (citing *Cannizzo*, 267 S.W.2d at 814). Thus, factors used in the analysis include legal permissibility, physical possibility, financial feasibility, and maximum productivity. *Id.* "The existing use of the land . . . is its presumed highest and best use, but the landowner can rebut this presumption by showing": "1. That the property is adaptable to the other use. 2. That the other use is reasonably probable within the immediate future, or within a reasonable time." and "3. That the market value of the land has been enhanced thereby." *Zwahr*, 88 S.W.3d at 628; *Cannizzo*, 267 S.W.2d at 814.

"Texas law permits landowners to introduce testimony that the condemned land is a self-sufficient separate economic unit, independent from the remainder of the parent tract with a different highest and best use and different value from the remaining land." *Zwahr*, 88 S.W.3d at 628 (citing *Bauer*, 704 S.W.2d at 109); *see also Cannizzo*, 267 S.W.2d at 814. When this occurs, the fair market value of the severed land can be independently assessed without consideration of the remainder. *Zwahr*, 88 S.W.3d at 628.

11

Once determined, the highest and best use of the property is then taken into consideration when conducting the appraisal. Texas courts have approved three methods of appraisal. The first, and most preferred, is the comparable sales method. *Home & Hearth Sugarland*, 215 S.W.3d at 512 (citing *Sharboneau*, 48 S.W.3d at 182). This method compares the values of similar properties in nearby locations. *Rice*, 96 S.W.3d at 647. It is typically "the most applicable method of valuing single-family houses, townhouses and condominiums." *Id.* Courts look to the replacement cost and income approach when comparable sales are not available. *Home & Hearth Sugarland*, 215 S.W.3d at 515; *see also Cherokee Water Co. v. Gregg Co. Appraisal Dist.*, 773 S.W.2d 949, 955 (Tex. App.—Tyler 1989), *aff'd*, 801 S.W.2d 872 (Tex. 1990).

Where "improved property . . . is unique in character and not frequently exchanged in the marketplace," appraisers can utilize the cost approach, which determines the current cost of replacing the improved property. *Home & Hearth Sugarland*, 215 S.W.3d at 515; *Rice*, 96 S.W.3d at 647. "After estimating the cost of building the structures on a property, and deducting an amount for depreciation, the appraiser adds the estimated value of the land and arrives at an indication of value." *Rice*, 96 S.W.3d at 647. This type of appraisal is normally conducted when valuing a building and the land on which it sits.

Where "the property, in the open market, would be priced according to the income it already generates," the income approach is appropriate. *Home & Hearth Sugarland*, 215 S.W.3d

at 515 (citing *Sharboneau*, 48 S.W.3d at 183). "By estimating this future income and applying a capitalization rate, the income approach allows the appraiser to arrive at a present value for the income-producing property." *Sharboneau*, 48 S.W.3d at 183. This valuation method is ideal for rental properties. "No matter which appraisal method an expert uses, the goal is always to find the fair market value of the condemned property." *Home & Hearth Sugarland*, 215 S.W.3d at 515.

Certain principles apply to all methods of valuation. Because value is determined at the time of the taking, "[t]he fact that previous improvements have been made by the condemnor or others is a factor which it is proper to consider." *McChristy*, 140 S.W.2d at 577; *Ware*, 86 S.W.3d at 822–23 ("[W]here the property is under a lease to a third party, the valuation of the various estates or leasehold interest is usually determined by ascertaining the market value of the property with the improvements thereon as though owned exclusively by one party."). This ensures the condemnee receives the current value of the property.

However, with respect only to the condemned land, the project enhancement rule generally "provides that the factfinder may not consider any enhancement to the value of the landowner's property that results from the taking itself," to avoid placing the landowner "in a better position than he would have enjoyed had there been no condemnation." *Zwahr*, 88 S.W.3d at 627–28 (citing *Corbin*, 504 S.W.2d at 830–31). This rule is in accordance with the concept that "[v]alue

to the taker is not the proper guide" and avoids a windfall to the condemnee. *Id.* at 631 (citing *Graves*, 488 S.W.2d at 138).

An exception to the project enhancement rule applies where a condemnor does not manifest intent to condemn a strip of land, but condemns nearby properties and improves them. *City of Dallas v. Shackelford*, 145 Tex. 528, 199 S.W.2d 503, 505–06 (1947); *see also Corbin*, 504 S.W.2d at 832. In such a case, by the time the condemnor decides to condemn the strip of land, its value may have potentially increased due to the improvements made by the condemnor on nearby properties. *See Shackelford*, 199 S.W.2d at 505–06; *Uehlinger v. State*, 387 S.W.2d 427, 432 (Tex. Civ. App.—Corpus Christi 1965, writ ref'd n.r.e.). Because, at the time of the taking, the price paid by a willing buyer would take into account the nearby improvements, a landowner would have to be compensated by the condemnor for the increased value of his or her property. In other words, the "project" in this scenario was the new, previously unannounced project, not the old, previously existing, ongoing projects. Thus, because the rule prohibits project enhancement, only consideration of the new "project" is prohibited.

The basic rules can be summarized in the following fashion:

1) the fair-market value of the land is measured at the time of taking;
2) the goal is to assess what value a knowledgeable willing seller-willing buyer would place on the property;
3) the highest and best use must be a use for which the property is *reasonably* adaptable and for which it is (or in all reasonable probability will become) available within the *foreseeable* future;
4) previous improvements, not a part of the "project" can be considered if they would be considered by a willing buyer or willing seller;

14

5)   any enhancement to the value of the landowner's property that results from the taking itself, i.e., the "project" cannot be considered; and

6)   the property must be valued using an accepted valuation method.

With these concepts in mind, we review the experts' testimony.

### C.   Bolton's Opinions

#### 1.   *Bolton Considered Niemiec's Opinions*

AV presented two expert witnesses, Niemiec and Bolton. Niemiec had expertise in the natural gas processing industry, having been president of Union Pacific Fuels, which owned seventeen processing plants. His experience included analyzing the economics associated with natural gas processing plants. Bolton was a real estate appraiser. Pipeline moved to exclude their testimony as unreliable and irrelevant under the *Daubert/Robinson* standard; the trial court overruled the motion.[11] Although Pipeline does not complain of the trial court's ruling with regard to Niemiec on appeal, Bolton relied upon Niemiec's testimony in rendering his expert opinion. Therefore, an understanding of Niemiec's opinions is necessary in order to comprehend Bolton's valuation of the land.

Niemiec emphasized that the property was unique due to the gas processing plant, the characteristics of the land, and the type of lease that existed prior to the taking. A gas processing plant cannot feasibly operate if it is built on a tract of land without access to pipelines to distribute

---

[11]AV argues that Pipeline waived the point of error that Bolton's testimony was unreliable and irrelevant by failing to object to his testimony. "To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered." *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998). Because Pipeline objected to Bolton's testimony before trial through a *Daubert/Robinson* motion to strike his testimony, and the trial court denied its motion, Pipeline's point of error was preserved.

the gas, proper permitting to authorize the operation, reasonably nearby gas production anticipated for a lengthy duration, and the proper amount of electrical supply. The subject tract of land has all of the necessary infrastructure and characteristics as a result of the operation of a gas processing plant on this property for more than thirty years, which enhances the value of this tract and distinguishes it from another nearby vacant tract of rural real estate.

Niemiec testified that buyers and sellers for this tract of land need to know the details about the prospect for gas production in the area, the details about the pipelines entering it, whether the site was permitted, and whether it had outlets for its product. A knowledgeable landowner would need to know all of the factors associated with the lease, the costs to move, the expiration conditions of the lease, and other parties that might be interested in leasing or buying the land. He then discussed many of those factors—in particular, the history of this lease and the unusual content of the most recent lease which allowed a reversion of the real estate to the landowners without an option to renew the lease. Niemiec explained that because this lease expired prior to the taking, the tenant (Processing) had the option to shut down the plant and acquire another site, move or build another plant, sell to another party, or continue to negotiate with the landowner.

As an expert in the gas processing industry, Niemiec testified that he evaluated the cost of moving and building a new plant to be $52 million without considering land costs and permits. The old plant could be sold for salvage for $14 million, leaving a net cost of moving at $38 million. Instead of moving, the tenant could build a temporary plant which would partially process the gas

16

and allow it to meet pipeline specifications. This would involve disassembling the old plant and moving to the other site at a net cost of $29 million. If the property had the improvements removed, which Pipeline had a right to do, and we do not speculate as to what action it would take, Niemiec testified that other companies would be interested in this real estate, and for approximately $74 million ($22 million for the land and $52 million for the plant) it would own a property and improvements that were valued at between $165 and $231 million and would generate income of $16.5 million per year. Thus, many buyers would be interested in this site.[12] Niemiec testified that a willing investor would pay from $18 to $22 million for the land, knowing the lease had expired and what would have to be done to move the plant.

### 2.      *Fair Market Value at the Time of Taking*

Bolton stated that he measured the fair market value of the land as of the date of the taking, which both parties stipulated was April 7, 2004. On that date, the lease had expired, the property was already improved by the gas processing plant, had a permit to operate, and was benefitted by fifteen or sixteen pipelines, each with its own easement.[13]

---

[12]Niemiec testified the Texas Railroad Commission has record of sixty pipeline companies in the area, all of which could be considered potential buyers.

[13]While Processing (a private company) made $13 million worth of improvements to the property, the plant was built by Tonkawa in 1973 and the pipelines were not owned by Processing. In other words, the condemnor did not make any enhancements on the property. This fact distinguishes many of the cases relied on by Pipeline.

*3.      Willing Buyer-Willing Seller*

Bolton utilized Neimiec's research in addressing the willing buyer-willing seller test. Bolton began with attempting to find comparable sales and agreed that the tract was unique. Bolton also appraised the property using two income analysis approaches. He testified that to find land to substitute or be equivalent to this site would require an expenditure of $38 million, plus the cost of the land. Bolton stated that the land provided a cost savings to a willing buyer since going to a new site would involve finding one with pipelines entering, obtaining permits, and doing title work. "Then you would have to build a plant that -- of $52 million." Bolton shared Neimiec's opinion that this location was unique because it was already permitted, had 138 KB power provided, was in the middle of a gas field, had fifteen or sixteen pipelines attached, and the market was not declining. If the plant was removed by the tenant, and the purchase of the land by a new buyer did not include the plant, the buyer would still save a lot of money because the land housed the pipelines that would allow the site to control most of the natural gas processing business. On the other hand, if the tenant decided not to remove the plant because building a new site would cost more than $50 million, and sold the existing plant for salvage value, the buyer would save $38 million since buying the salvage of the existing plant would cost $14 million.

*4.      Highest and Best Use Took Into Consideration Previous Improvements*

Bolton determined that the land's highest and best use was for an industrial gas processing plant and that the active market included gas processors. Because the land had been adapted and

used in that manner for over thirty years, this highest and best use was foreseeable. In establishing the highest and best use of the property and appraising the real estate, Bolton took into consideration the fact that a gas processing plant had been established for many years and that fifteen or sixteen pipelines were connected to the property. Pipeline's expert agreed the land was a good site for a gas processing plant.

5. *Methodology*

Bolton first appraised the real estate using the comparable sales approach. There was not much dispute that the attributes of this real estate caused it to be one of a kind. Because of this uniqueness, the use of traditional comparable sales comparisons procedure was a challenging task. Bolton used the traditional approach in attempting to find other industrial real estate sites. Bolton testified that he reviewed the differences in the uses, locations, and market conditions between the subject property and comparable tracts, and adjusted for the unique feature of this tract "having the pipelines, the lease and the tenant improvements and the unique location of the 23.79 acres." Based on the comparable sales approach, Bolton appraised the 23.79 acres at $20,955,000.00. Pipeline's expert appraiser, Donnie Sherwood, said he had no criticisms about Bolton's methodology and possessed no information to dispute the figures.

Considering Niemiec's findings, Bolton also used the income approach to "analyze[] what a prudent and knowledgeable investor would pay for the leased land, which includes the terms of

19

the Lease Agreement, considering the gas processing facility must be removed and the land restored, within a six month period." Bolton explained:

> [W]e take or analyze the amount of income the property can produce, subtract the expenses that are necessary to produce that income, and then we do a calculation called capitalization, and this is, we use a typical rate of return for that type of property to convert it to value . . . analyz[ing] such comparable rental data as are available.

This discounted cash flow analysis considered a three-year hypothetical lease, with nominal annual rents paid at the beginning of each year, followed by a reversion of the land at the end of the third year. The rental amounts for years one through three were discounted to present value (based on the date of taking), with the value of the discounted reversions added. The reversionary interest in this instance was the major value. Using this analysis, Bolton found the market value of the subject tract as $18.9 million.

A third method of appraisal by Bolton was the direct capitalization approach, which is based on one year's estimated net operating income derived from a market land lease rate. The annual lease payment would be based on the cost savings to be realized by the plant owner if a long-term lease could be entered. Those costs range from $20 million, plus business disruption to $29 million to $38 million to avoid much of the business disruption. Land lease rates of return for industrial sites range from 4.8 percent to 10.63 percent. Based on these rates, a reasonable market rental rate of $1.8 million per year to $2.3 million per year would be yielded. Capitalizing the

annual net operating income using a capitalization rate of 8.0 percent results in a value to the economic unit including the lease agreement terms as of April 7, 2004, of $22,275,000.00.

### D.     Pipeline's Complaints

Pipeline argues that Bolton's appraisal improperly:   (1) included value of improvements to the property; (2) analyzed the land's value to Pipeline; (3) included project influence; (4) violated the undivided fee rule; (5) improperly considered Processing's business revenues; and (6) improperly relied on incomparable sales data.

### 1.     *Value of Improvements Until Time of Taking Can Be Considered*

The record and caselaw demonstrate that AV was entitled to consider the effect of improvements when determining the fair market value of the condemned land.   Contrary to Pipeline's assertions, the experts clarified they did not consider value to Pipeline, but that knowledge of the value of the unique nature of the property was taken into consideration in determining the fair market value between a willing seller and willing buyer, which in this case would most likely be another natural gas pipeline company.   Rule 1-2(e) of USPAP rules provides:

> In developing a real property appraisal, an appraiser must: . . . (e) identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal, including:   (i) its location and physical, legal, and economic attributes; . . . (iii) any personal property, trade fixtures, or intangible items that are not real property but are included in the appraisal; (iv) any known easements, restrictions, encumbrances, leases . . . .

http://www.uspap.org/2010USPAP/USPAP/stds/sr1_2.htm. Also, Rule 1-4(g) makes clear, "When personal property, trade fixtures, or intangible items are included in the appraisal, the appraiser must analyze the effect on value of such non-real property items." http://www.uspap.org/2010USPAP/USPAP/stds/sr1_4.htm.

To assess what effect the improvements had on the land value, Bolton relied upon Niemiec's calculations recited above. Niemiec's focus was on potential buyers who would be interested in the cost savings provided by the unique situation of the expiration of the lease which occurred prior to the date of the taking. Niemiec reasoned:

> Someone coming in, looking at the situation with the lease expired would look at this and say, "It's a great site; I could purchase the lease from the landlord," and then the tenant, any tenant, or in this case, [Processing], would have a choice to either negotiate now with the new owner of the lease, . . . or they would simply continue on and move their -- remove their site, remove their improvements, their plant from this site per the lease.

"The pipelines out of the plant are pipelines that would be able to be utilized by any third party. And the gathering system contracts would allow the producer to move the gas to the plant site." The savings advantage to the potential buyer could also be used to negotiate a higher rent from AV's standpoint. According to Niemiec, "knowing what I know about the site and the lease, . . . [a potential buyer] would be willing to put up a minimum of $18 million for the" surface land because "the pipeline is coming in; the pipeline is going out; the air permits; the electrical power that's there; the customers are all still there." He also testified the land was worth that much because it "has been prepared, and it has the infrastructure to handle all of these incoming and

22

outgoing pipes." Even if the investors paid $22 million for the real estate, a new plant could be built on this site that is already permitted and has the incoming pipelines for $50 million, resulting in a total investment of $72 million to acquire a plant worth between $165 million and $231 million.

We find that to properly appraise this real estate, one cannot ignore the fact that a gas processing plant is and has been established on it for more than thirty years. It is true that this is an extremely unusual situation (that a major processing plant is built on real estate on which the lease has expired with no option to renew), but the appraisers and this Court must acknowledge the existing facts; it is not improper to consider any effect the improvements and the expiring lease have on the value of the underlying real estate.

### 2. *Bolton Did Not Use Value to the Taker*

Bolton testified that he did not assess value to Pipeline and that if he had, AV would have asked for more since the plant and land together were valued between $165 million and $231 million.

Pipeline complains "Bolton plays upon the land's special value to Enbridge by asserting there would be a 'free-market' to buy the surface of land and *resell it to Enbridge at a hold–up price*." We find nothing in the record to support the notion that Bolton's analysis envisions attempting to resell the land to Pipeline.

23

Next, Pipeline argues that Bolton's testimony violated the "first" kind of project influence by considering the special value of AV's land to Pipeline's public project. In doing so, Pipeline argues that Bolton considered Pipeline's costs and profits in operating the plant and speculated about its business decisions. Pipeline also argues that AV is attempting to recover the costs to Pipeline, rather than the fair market value through Bolton's reliance on possible costs to move the plant to another location. Pipeline complains Bolton erroneously includes testimony of "cost savings" or what Pipeline refers to as "opportunity cost." This is an argument that Bolton assessed value to the taker.

In support of its argument, Pipeline cites *Northwest Pipeline Corp. v. 95.02 Acres of Land, more or less, in Power County, Idaho*, No. CV-01-628-E-BLW, 2003 WL 25768634 (D. Idaho Dec. 19, 2003) (mem. op. & order). Even if this case (an unpublished federal district court ruling on a motion in limine) had precedential value, it is far different from the case at hand. In *Northwest Pipeline*, the pipeline company condemned property on an Indian reservation which already had an easement. The offer of proof was the alternative cost of rerouting the pipeline hundreds of miles completely off the reservation. The district court properly found that such alternative cost was not a measure of the market value of the real estate.

In *Northwest Pipeline*, the evidence of the cost of placing a pipeline completely off the Indian reservation had no relation or bearing on the market value of the property. By contrast, the evidence of cost here related to a determination of the market value of the real estate upon which a

gas processing plant has been operational for many years. Both Bolton and Niemiec testified to costs of moving and building a new plant, but we understand that evidence was presented in an effort to display what a willing, knowledgeable buyer would pay for the land. Such testimony is relevant in considering the financial feasibility of a property, the highest and best use of the property, as well as an appraisal of what a knowledgeable buyer would pay. The experts identified more than sixteen other potential buyers in this market, including many other gas companies that have direct ties to the East Texas oil field, as well over sixty gas pipeline companies.

Pipeline urges it is unfair that a condemnor be required to pay the enhanced price which its demand alone has created. It complains that AV is attempting to obtain a special value to the condemnor as distinguished from others who may or may not have the power of eminent domain. *United States v. Cors*, 337 U.S. 325 (1949). Pipeline cites cases in which the same government entity condemning the property was asked to pay for a leasehold, easement, or other right which it owned prior to condemnation, on the basis that the continued revenue was expected. However, in these cases, there was no evidence that there was a market which would be available to purchase to the interest. Rather, the condemnor either created demand for the property or was the sole market for the property. Thus, these cases did not allow evidence of the owner's special need in the property. *Id.* at 333 (government should not have to pay enhanced value for tug boat in time of war where market prices were inflated for war vessels due to government's need for them during

25

war time); *United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366 (9th Cir. 1976) (company not entitled to payments for use of road owned by private company leading to federal timberland where government had exclusive licenses to use road prior to condemnation); *see also Graves*, 488 S.W.2d at 136–38 (condemnor's cost to construct future transmission line irrelevant to fair market value of easement for electrical transmission line on date of taking).

Here, the action of Pipeline in condemning this property did not create a special need demand for the real estate; that market had been created by years of use of the real estate as a gas processing plant. For thirty years, other companies constructed the improvements and used this property for gas processing. The evidence shows there is a large demand for natural gas which must be processed before entering the pipelines for delivery to consumers. Many companies are profitably conducting such business. While the unique circumstances of this lease expiration may have presented a rare opportunity for competing companies to attempt to acquire this real estate, the value of the real estate is not a result of the condemnation and does not depend on Pipeline either continuing operation or removing its property.

Our conclusion was supported many years ago, when the Supreme Court of the United States addressed an analogous situation in *Boom Co. v. Patterson*, 98 U.S. 403 (1878). In earlier days, the rivers, especially the Mississippi River, served as major transportation avenues for commercial goods. Logging was an industry that apparently relied on the Mississippi River for transportation to the market. Patterson owned three islands located in the Mississippi River,

26

enabling him to construct a boom (a series of chains or cables, or timbers to confine floating timber) attached to the west bank of the river capable of holding over twenty million feet of logs. This added great value to the three islands. *Id*. at 408. The condemning authority also planned to use the three islands as a boom; it argued that the adaptability of this land for use as a boom should not be considered since only the Boom Company was authorized to receive and manage timber on the Mississippi River. The Supreme Court found that such authority did not apply to timbers of parties "choosing to keep the control and management of them in their own hands." *Id*. at 409. Consequently, the three islands were valuable for use as a boom, not only to the condemning authority, but also to other parties; therefore, the property could properly be evaluated to include that enhanced value.

While we recognize the difference in this case is that AV owns only the real estate and not the improvements, the reasoning of the *Boom Co*. case concerning the value to the taker argument is applicable. The value of this real estate as a gas processing plant site is not exclusive to Pipeline. Therefore, Bolton's assessment was of the fair market value, not the value to the taker.

### 3. *Bolton Did Not Violate the Project Influence Rule*

Bolton testified he did not take into consideration the effect of the condemnation proceeding, negating Pipeline's application of the project influence rule. Pipeline did not manifest intention to condemn the property until the March 10 letter. Therefore, because there was no further Pipeline "project," Bolton concluded the project enhancement rule did not apply,

27

and he took into consideration, in accordance with Rule 1-2(e), the fact that the land housed a multi-million dollar plant and was subject to the pipeline easements. He assumed, because it would be financially unfeasible for Pipeline to remove the gas processing plant,[14] that it would renew the lease, or that another company would lease the site. He based his opinion on what the annual market rent lease payment would be, taking into account cost savings that a potential plant owner would realize on a long-term lease. Bolton appraised the surface interest in the 23.79 acres as $20,955,000.00. Bolton made clear that while the improvements were taken into consideration, he did not actually appraise them; rather, he considered the improvement values to aid his conclusion in determining the fair market value of the surface land underneath them.

a. *Pipeline Built No Improvements; Therefore, Consideration of the Processing Facility Does Not Violate Project Enhancement Rule*

Pipeline cites many cases, both federal and state, with respect to the issue of project influence. Some of the cases are distinguishable because they involve fact patterns in which the condemnor built projects in surrounding areas while indicating intent to condemn the subject property. *Corbin*, 504 S.W.2d at 831 ("enhancement is allowed up to the time that the condemnor manifests a definite purpose to take the particular land"). Here, the landowners could only include previously built projects when assessing the fair market value of their property on the date of the taking if they existed before the condemnor manifested desire to condemn. *Shackelford*, 199 S.W.2d at 505–06 (concluding "it was entirely proper for the jury to take into consideration

---

[14]Bolton and Niemiec testified it might cost $38 million to move the plant and up to $52 million if business disruption was taken into account.

[the property's] enhanced value [from existing public marketplace project]" "in view of the fact that there was no definite purpose manifested by the City to take [the subject property]" until later). Here, the condemnor, Pipeline, did not build any improvements. Therefore, these cases are not controlling.

> b. *AV Is Not Seeking Value of Processing Facility: This Is Not a Fixtures Case*

Other cited cases all contained a common, distinguishable fact pattern where a condemnor, under a lease or otherwise, built improvements for which the landowner sought compensation. *Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440 (9th Cir. 1987); *United States v. Delaware, L. & W.R. Co.*, 264 F.2d 112 (3rd Cir. 1959); *Anderson-Tully Co. v. United States*, 189 F.2d 192 (5th Cir. 1951); *Old Dominion Land Co. v. United States*, 296 F. 20 (4th Cir. 1924).

> i. *Anderson-Tully*

Pipeline relies most on *Anderson-Tully*, but the analysis of that case distinguishes all the above-cited cases. In *Anderson-Tully*, the government leased property and built a piling structure thereon. The lease required improvements to be removed at the end of the lease term. *Id.* at 194–95. After expiration of the lease, the government decided to condemn the property. However, in *Anderson-Tully*, the landowner claimed that the law of fixtures and contract converted the piling structure to realty which should have been included in the award for just compensation. *Id.* at 196. The landowner sought to introduce evidence of the cost of replacing the condemned area. The court in *Anderson-Tully* pointed out that

29

the character of the evidence sought to be adduced was not "reproduction" evidence in the usual sense, that is relating to the cost of reproducing structures or other improvements to the land, but was evidence as to the estimated cost which would be incurred if someone wished to fill and otherwise improve an adjacent tract of land in order to make it physically identical to the land taken.

*Id.* at 195. Here, AV never sought to introduce evidence of the cost to obtain easements and install pipelines, proper power lines, etc., to make another tract physically identical, but since the highest and best use of the property was for a gas processing plant, evidence of the cost of the plant to a third party that might buy the real estate was relevant and altogether different from the type of evidence sought to be presented in *Anderson-Tully*.

### ii. *United States v. Delaware, L. & W.R. Co.*

Pipeline relies heavily on *United States v. Delaware, L. & W.R. Co.*, 264 F.2d 112. There, the railway company owned land that was leased to Hoffman Machinery for fifteen months during the Korean War, which was used to manufacture large caliber shells. Hoffman had a contract with the government that included reimbursement for improvements placed on the property which enhanced its value by $250,000.00 to $300,000.00. All improvements were paid for by the government. The government began condemnation proceedings in August 1954. Delaware L.W.R. argued that it should receive the enhanced value of the property. In other words, the government would be required to pay the railway for the enhanced value of the property after it had paid for the installation of the improvements giving rise to the enhancement. The lease between Hoffman and the railway allowed it to remove all improvements at the lease expiration.

30

First, the court held that whether the lessee would have actually removed the improvements was not relevant; rather, the issue was what the reversioner was entitled to at the end of the term. The court further held that the government was placed in the position of the lessee by reason of its contract to indemnify Hoffman for the costs of improvements. Even if the improvements were considered fixtures attached to the realty, special considerations in a condemnation case are present when the government caused the improvements to be made originally. The court held that the fixtures law has no application in such a situation.

The most obvious differences with *Delaware, L. & W.R.* are: (1) the landowner was asking the government to pay the enhanced value even though the government had originally installed all improvements, whereas here the enhancement was from prior private tenants as well as third parties adding the adjacent pipelines which fed gas to the plant; and (2) the issue of fixtures is not involved in this case.

We agree with the *Delaware, L. & W.R.* opinion that the relevant issue is not the cost that might be incurred by Pipeline by removing the entire structure or taking other measures. The issue is the value of the real estate that reverts to AV after Pipeline either removes all the property or attempts some other measures.

### iii. Pipeline's Other Cited Cases Do Not Apply

The last category of cited cases does not apply.[15] *United States ex rel. and for Use of Tenn. Valley Auth. v. Powelson*, 319 U.S. 266 (1943) (landowner cannot recover consequential damages of lost business earnings as result of condemnation); *Tex. Elec. Serv. Co. v. Lineberry*, 162 Tex. 570, 349 S.W.2d 105 (1961) (expert improperly used capitalization appraisal approach to value sale of easement where there was no evidence it was previously an income-generating property); *Tex. & New Orleans Ry. Co. v. Sutor*, 56 Tex. 496 (1882) (trespass to try title suit finding landowner who permits railroad company to build roads on land without charge on condition that ditches be constructed to carry off water cannot declare right-of-way forfeited for failure to meet conditions after seventeen years); *McAshan v. Delhi Gas Pipeline Corp.*, 739 S.W.2d 130 (Tex. App.—San Antonio 1987, no writ) (where land's current use was for ranchland at time of taking, evidence that property would be ideal for compressor site, and valuation thereon was irrelevant).

In this case, AV agrees that the processing plant belongs to Pipeline and is not seeking compensation for this improvement. Here, the cost testimony related to the amount a purchaser of the real estate would expect to spend to build another gas plant if Pipeline removed it. The

---

[15]Pipeline also cites extensively to *Zwahr*, 88 S.W.3d 623. In that case, error stemmed from the fact that the expert looked only to the part taken to determine that the highest and best use of the property was for a pipeline easement. *Id.* at 626. However, unlike this case, the property taken in *Zwahr* was not a separate economic unit. *Id.* Because the economic unit's highest and best use was farmland or rural-residential, and the expert failed to evaluate the whole economic unit, his opinion was unreliable. *Id.* at 626–27; *Bulanek v. Westtex 66 Pipeline Co.*, 209 S.W.3d 98, 99–100 (Tex. 2006). In this case, the part taken is a freestanding economic unit, as demonstrated by its usage. 23.79 acres had been used for the gas processing plant for years and the additional 4.5 acres were needed for access. *Zwahr*, 88 S.W.3d at 626–27.

relevance of this testimony was to show that another gas processor could spend $52 million to rebuild a new plant on the property, buy the real estate for $22 million which already had all the infrastructure needed for gas processing, and result in a savings to the potential purchaser, who would then own an entire gas processing facility worth $165 to $231 million. Because Bolton did not take into consideration the effect of the condemnation proceeding, he did not violate the project influence rule.

### 4. The Undivided Fee Rule Does Not Apply

Pipeline claims Bolton's testimony violated the undivided fee rule. The rule is simple: Where there is more than one interest in a property, i.e., a fee interest and a leasehold, both the fee holder and leaseholder are entitled to compensation. The fair market value of the property as a whole with improvements must first be assessed and then divided according to the respective interests. In other words, the value given to both the fee holder and interest holder when aggregated cannot exceed the fair market value of the property. *Ware*, 86 S.W.3d at 822–23.[16] Again, this rule ensures no party receives a windfall. At the time this property was taken, the lease had expired and the lessee's remaining right or duty was to remove the improvements within

---

[16]"Where there are different estates in the property or where the property is under a lease to a third party, the valuation of the various estates or leasehold interest is usually determined by ascertaining the market value of the property with the improvements thereon as though owned exclusively by one party, and, in the absence of damages to other property not taken, this ordinarily determines the extent of the liability of the party condemning the property." *Ware*, 86 S.W.3d at 822–23.

six months. We find that the undivided fee rule does not apply.[17] The only party entitled to compensation was AV, as Processing's right to use the property had expired prior to condemnation.

### 5. Bolton Did Not Consider Pipeline's Business Revenues

Pipeline next argues that Bolton's decision to value the property's highest best use as a natural gas processing plant, taking into consideration Pipeline's business revenues, violated the value to the taker rule. Pipeline relies on *State v. Central Expressway Sign Associates*, in which the State condemned Central's billboard easement leased to a third party. 302 S.W.3d 866, 869 (Tex. 2009). There, the trial court excluded the expert's valuation testimony since he did not take the lessee's business revenue into consideration. The Texas Supreme Court found that to be error. *Id.* In *Central Expressway Sign*, the State had settled its condemnation suit against the lessee by paying just compensation in the form of relocation benefits. *Id.* In other words, because the only interest that had to be valued was the lessor's interest, and the lessor did not have any interest in the lessee's lost profits, evidence of the lessee's business revenues was irrelevant. Here, there is no evidence in the record that Bolton relied on Pipeline's business revenues. Instead, Bolton estimated cost savings to a potential purchaser of the land in order to calculate the financial feasibility factor to determine the property's highest and best use in evaluating fair

---

[17]The jury correctly assessed fair market value of the condemned property as a whole.

market value.   Pipeline's expert Sherwood agreed that an appraiser may adjust for cost savings to a potential buyer when considering land value.

### 6. *Bolton's Comparable Sales Data*

Finally, Pipeline contends Bolton improperly relied on incomparable sales data.   Bolton examined land sales of industrial sites in several Texas counties between September 2002 and April 2006.   In his expert report, Bolton lists six comparable sales transactions involving industrial tracts.   The sales prices were in a range from $5,500.00 to $21,905.00 per acre.   There was evidence that for any company to build an equivalent plant, it would incur a cost of $52 million.   However, a plant cannot feasibly operate if it is built on a tract of land without access to pipelines to distribute the gas, proper permitting to authorize the operation, reasonably nearby gas production anticipated for a lengthy duration, and the proper amount of electrical supply.   The subject tract of land has all of the necessary infrastructure and characteristics as a result of the operation of a gas processing plant on this property for more than thirty years, which enhances the value of this tract and distinguishes it from another nearby vacant tract of rural real estate. Niemiec's testimony was that a willing buyer, understanding these facts, would invest $18 to $22 million for this real estate.   If the property had the improvements removed, which Pipeline had a duty to do, and we do not speculate as to what action it would take, Niemiec testified that other companies would be interested in this real estate, and for approximately $74 million ($22 million for the land and $52 million for the plant) it would own a property and improvements that were

valued at between $165 and $231 million and would generate income of $16.5 million per year. We believe it was proper to consider this evidence and make adjustments in appraising the real estate.

> 7. *Trial Court Did Not Err in Denying Pipeline's Motion to Strike Bolton's Testimony*

In summary, Bolton assessed the fair-market value of the land based on the willing seller-willing buyer test as of the stipulated date of the taking. His assessment of the land's highest and best use as a gas processing facility was the reasonable and foreseeable presumed highest and best use. Because the gas processing facility, pipeline easements, and other improvements were in place prior to the date of the taking, Bolton determined their impact on the fair market value of the land, since such assessments would be considered by a willing buyer. There were no enhancements in value resulting from the actual condemnation, and value to the taker was not utilized. Finally, Bolton utilized the accepted income approach valuation method, yielding a figure using a methodology unchallenged by Pipeline's experts. Based on the record and precedent before us, we conclude that the trial court did not abuse its discretion in finding Bolton's testimony regarding market value relevant, reliable, and thus, admissible. Pipeline's first point of error is overruled.

## E. Application to Pipeline's Expert, Albert Allen

Allen determined that the condemned land's highest and best use was for rural residential purposes. He stated in his deposition that he did not analyze any other use. Further, Allen

36

admitted that he did not take into consideration any pipelines, easements, permits, etc., because he was told to value the land as vacant. Allen's fair market value for the property was $47,940.00.

AV objected to the inclusion of Allen's testimony on the grounds, among others, that he: (1) used an incorrect highest and best use for the property; (2) failed to analyze the income approach; (3) assumed the property was barren, and did not take into consideration the effect of improvements listed under USPAP Rules 1-2 and 1-4. Essentially, AV complained that Allen valued the property as it existed in 1973.

"The existing use of the land . . . is its presumed highest and best use." *Zwahr*, 88 S.W.3d at 628. Pipeline argues that a jury may decide between two highest and best uses. While true, in order to be considered as a relevant highest and best use, use of the property as rural residential must be reasonably adaptable within the foreseeable future. *Wayne*, 266 S.W.3d at 45; *Bauer*, 704 S.W.2d at 109, 112 (on property containing established pipeline corridor, highest and best possible use of severed condemned land was for sale of pipeline easements). Pipeline was required to meet the burden to defeat the presumption that the current use was the best use by showing it was legally permitted, physically possible, and financially feasible for the property to be considered rural residential and that such classification would yield maximum productivity. *Zwahr*, 88 S.W.3d at 628.

The property has been granted permits to operate as a natural gas facility. There is no evidence indicating that the 23.79 acres would be classified as residential property in the

foreseeable future. Bolton testified that residential properties could not be built where the pipelines existed due to the pipeline easements. Use of property for residential purposes would likely not be legally permitted. Nevertheless, Allen's "conclusions assume[d] that a zoning change would be likely."[18] In order to prepare the site for residential use, the existing gas plant would have to be torn down and the property prepared for multiple housing. Allen did not explain why the existing use of the property would not continue as the highest and best use, did not explain why he overlooked the thirty-year history of that use, and did not consider the effects of the easements or how building residential units was financially feasible. The trial court found Allen's opinion attempted to "create [a] total fiction, appraisal in a vacuum." While use as residential property could theoretically be physically possible, it would not be financially feasible. Consideration of the highest and best use "cannot be given to uses which are purely speculative and unavailable." *Home & Hearth Sugarland*, 215 S.W.3d at 511 (citing *Cannizzo*, 267 S.W.2d at 814).

"Unless an appraisal gives a value based on the land's condition at the time of condemnation -- taking into account all relevant factors that affect its valuation, including the market for its possible future use -- it is not relevant to the issue of market value." *Sharboneau*, 48 S.W.3d at 185. Not only did Allen fail to explain why the existing use of the property would not be presumed as the highest and best use, his opinion did not offer fair market value of the land

---

[18]It is unlikely that zoning is involved as the property is located in a rural area and does not appear to be within the jurisdiction of any municipality.

based on its condition at the time of the condemnation and did not account for all relevant factors affecting valuation. The trial court was within its discretion to conclude Allen's opinion was unreliable. *Zwahr*, 88 S.W.3d at 631. We overrule Pipeline's second point of error.

## IV.    PIPELINE WAS NOT ENTITLED TO DIRECTED VERDICT AND JNOV

Pipeline's arguments with respect to directed verdict and judgment notwithstanding the verdict are both based on the premise that Bolton's testimony should have been excluded. It argues that absent Bolton's testimony, there was no basis for the jury award of $20,955,000.00. Thus, Pipeline claims that the trial court should have directed verdict in AV's favor only in the amount of $300,000.00. We have already determined that the trial court did not err in admitting Bolton's testimony.

The standard of review for both judgment notwithstanding the verdict and the denial of a directed verdict is a legal sufficiency or "no evidence" standard of review. *Mauricio v. Castro*, 287 S.W.3d 476, 478 (Tex. App.—Dallas 2009, no pet.); *Home & Hearth Sugarland*, 215 S.W.3d at 516 (citing *Sherman v. First Nat'l Bank in Center, Tex.*, 760 S.W.2d 240, 242 (Tex. 1988)). In this case, a directed verdict or judgment notwithstanding the verdict for Pipeline would only be proper if AV failed to present any evidence raising a fact issue entitling it to recover the fair market value as assessed. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). We will review the evidence in the light most favorable to the jury's finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless

reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005); *Home & Hearth Sugarland*, 215 S.W.3d at 515.

Aside from Bolton's valuation testimony, the jury heard from another industry expert. Niemiec had been involved in the oil and gas industry since the 1970s. He graduated from Princeton, attended the advanced management program at Harvard Business School and Cornell University, worked for Exxon and then Union Pacific Fuels, eventually becoming the president of that company. Niemiec's responsibilities included project approvals and oversight of seventeen processing plant sales, in which he acquired the skills to understand the "microeconomics of processing plants." He possessed unique skills in evaluating what a potential natural gas company would consider when purchasing property. Niemiec's testimony, which was not challenged on appeal, was that a willing buyer would pay between $18 million and $22 million for the land only. Thus, the trial court did not err in overruling Pipeline's motions for directed verdict and judgment notwithstanding the verdict, given this record. Pipeline's third point of error is overruled.

## V.     FAILURE TO PRESERVE ERROR REGARDING JURY INSTRUCTIONS

The entirety of Pipeline's argument with respect to this point of error states:

Because the trial court improperly allowed Mr. Bolton's conclusions of value over proper objections, the court should have allowed the jury to be properly instructed on the foregoing legal principles. The requested and refused instructions were submitted to the court prior to the ultimate preparation of the jury charge and argument to the jury. These instructions, reflecting the principles set out above, are part of the record at CR 7:547-568; App. Ex. 4.

Rule 38.1(i) of the Texas Rules of Appellate Procedure requires that a brief contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Bare assertions of error, without argument or authority, waive error. *Bufkin v. Bufkin*, 259 S.W.3d 343, 354 (Tex. App.—Dallas 2008, pet. denied); *see Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing "long-standing rule" that point may be waived due to inadequate briefing). Pipeline fails to cite any authority for this point of error in its brief. It does not discuss why each particular instruction was necessary and proper. Thus, we conclude Pipeline's brief is inadequate with respect to this point of error and presents nothing for review. We overrule its last point of error.

## VI. CONCLUSION

We affirm the judgment of the trial court.

Jack Carter
Justice

Date Submitted:     June 30, 2010
Date Decided:       October 27, 2010

41